HULL-DOBBS CO. OF PUERTO RICO y CECILIO MONTALVO, peticionarios, *v.* TRIBUNAL SUPERIOR DE PUERTO RICO, SALA DE SAN JUAN, HON. J. M. ALMODÓVAR ACEVEDO, JUEZ, demandado; AMADO VEGA VEGA, interventor.

Número 2298.

*Sometido:* 15 de octubre de 1958. *Resuelto:* 9 de abril de 1959.

*Benicio Sánchez Castaño, Rafael Rivero Cervera* y *Pascual Amado Rivera,* abogados de los peticionarios; *Luis A. Negrón López,* abogado del interventor.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ MATOS emitió la opinión del Tribunal.

Toda la cuestión debatida en este recurso se reduce a determinar si los compradores sucesivos de un automóvil hipotecado, cuyas adquisiciones no fueron consentidas por el acreedor hipotecario, están obligados a satisfacer el valor del automóvil al vencerse y no pagarse la obligación garantizada, no obstante poner ambos a disposición del acreedor la cosa hipotecada para que ejecute el crédito hipotecario.

El 11 de diciembre de 1952 Florencio Vélez Maldonado compró a Amado Vega un automóvil marca De Soto, modelo de 1948, por el precio de $1,200, del que pagó parte en efectivo, obligándose a satisfacer el remanente de $1,032 el 11 de diciembre de 1953. Por esos $1,032 y sus intereses de mora al 9 por ciento anual y un crédito adicional de $250 para gastos, costas y honorarios de abogado en caso de reclamación judicial, Vélez Maldonado, en el mismo día de la venta, otorgó a favor del vendedor Amado Vega, un pagaré que garantizó con hipoteca sobre el mismo automóvil. [1]

---

[1] En el contrato de hipoteca, entre otras cosas, se estipuló lo siguiente:

"CUARTO: El deudor hipotecario conviene en que: Primero: Está en posesión de y tiene un título de la propiedad anteriormente descrita. Se-

Comprador y vendedor residían en la población de Sabana Grande. La hipoteca fue inscrita en el Registro de Hipotecas de Bienes Muebles del Registro de la Propiedad de San Germán, el 24 de diciembre de 1952. El 12 de febrero de 1953 se hizo constar el traspaso del vehículo a favor de Vélez Maldonado en la División de Vehículos de Motor del Departamento de Obras Públicas.

El 24 de febrero de 1953 Vélez Maldonado vendió a la corporación Hull-Dobbs Co. of Puerto Rico el automóvil hipotecado sin que consintiera en la venta el acreedor hipotecario Amado Vega. La corporación adquirente inscribió a su nombre el automóvil en dicha División de Vehículos de Motor. El 1ro de marzo de 1953 lo vendió a Cecilio Montalvo, residente en Río Piedras. Montalvo hizo inscribir el traspaso a

gundo: Cuidará debidamente de la propiedad que por la presente hipoteca; pagará puntualmente todas las contribuciones, *gravámenes y cargas de cualquier otra naturaleza que se impongan o graven la propiedad hipotecada mientras la presente hipoteca esté en toda su fuerza y vigor.* Tercero: El acreedor hipotecario *podrá entrar en cualquier tiempo razonable donde se encuentren dichos bienes e inspeccionarlos debidamente.* Quinto: En caso de mora de cualquier pago garantizado por la presente o de cualquier plazo de principal; o si el deudor hipotecario dejare de cumplir con cualquiera de las obligaciones en el presente documento; o si el deudor hipotecario fuere adjudicado en quiebra, o si cualquier parte de la propiedad que por la presente se hipoteca fuere embargada o ejecutada por cualquier otra persona que el acreedor hipotecario; o si el deudor hipotecario falleciere o se incapacitara *o en el caso de que el acreedor hipotecario no se considerara debidamente garantizado, en cualquiera de dichos casos, el acreedor hipotecario podrá: Primero: Declarar toda deuda que por la presente se garantiza vencida y pagadera.*—Segundo: Hacer aquellos gastos y *dar aquellos pasos que a su juicio fueren necesarios para mantener el valor o proteger o conservar la propiedad* por la presente hipotecada.—Tercero: Ejecutar esta hipoteca tomando posesión de la propiedad por la presente hipotecada para satisfacer el pago de la deuda que por la presente se garantiza, vendiendo la referida propiedad en la manera dispuesta en la Ley sobre Hipotecas de Bienes Muebles.—Sexto: Cualquier gasto en que incurriere el acreedor hipotecario en mantener el valor de, proteger o conservar la propiedad que por la presente se hipoteca o cualquier gastos en la ejecución, cuido, transportación o venta de la propiedad ejecutada desde la fecha que tales gastos se hicieren hasta su pago total, serán pagaderos al acreedor hipotecario por el deudor hipotecario en el mismo sitio que se conviene dicho pago en el pagaré aquí garantizado y a tales gastos se considerarán desde ahora como también garantizados por esta hipoteca." (Itálicas nuestras.)

su favor tomando posesión material del vehículo que había sido trasladado a San Juan por la Hull-Dobbs Co.

Ni para su traslado ni para esta segunda venta tampoco consintió el acreedor hipotecario. De los autos no se desprende que los compradores asumieron expresamente el pago del importe del crédito hipotecario ni que el mismo fuera parte del precio de los respectivos traspasos. La deuda venció el 11 de diciembre de 1953 sin que la pagaran Vélez Maldonado, la Hull-Dobbs Co. o Cecilio Montalvo.

El 31 de diciembre de 1953 el acreedor hipotecario Amado Vega requirió por escrito al alguacil del Tribunal de Distrito, Sala de San Germán, para que tomara "posesión inmediata de la propiedad descrita [el vehículo hipotecado] con el fin de que se venda según lo dispuesto en el Artículo 14 de la Ley núm. 19 aprobada en 3 de junio de 1927." En el mismo día dicho alguacil entregó copia del requerimiento a Vélez Maldonado y devolvió su original certificando: "Que la propiedad hipotecada no pudo ser recuperada por haberla vendido el demandado Florencio Vélez Maldonado según su propia información."

En esa misma fecha, 31 de diciembre de 1953, Amado Vega presentó en el Tribunal de Distrito, Sala de San Germán, una demanda contra Florencio Vélez Maldonado, Hull-Dobbs Co. of Puerto Rico y Cecilio Montalvo sobre "cobro de Crédito Hipotecario de Bienes Muebles." (²)

---

(²) Después de relacionarse en la demanda la constitución de la hipoteca, se alegó y suplicó como sigue:

"3º Que dicha hipoteca de bienes muebles no ha sido cancelada, ni la condición que la misma garantiza ha sido cumplida mediante el pago de la obligación antes reseñada no obstante las gestiones del demandante, y que transcurridos 10 días después del incumplimiento de dicha obligación el demandante inició el procedimiento de ley para obtener el pago de la misma mediante la venta en pública subasta de la propiedad hipotecada, siendo imposible obtener el pago de dicha obligación en esta forma por haber dispuesto el deudor hipotecario de dicha propiedad según se alegará más adelante.

"4º Que con fecha 24 de febrero de 1953 la codemandada Hull-Dobbs Co. of Puerto Rico, no obstante tener conocimiento de dicha hipoteca por su inscripción en el Registro, adquirió la propiedad hipotecada por compra del demandado Florencio Vélez Maldonado, y que con fecha 1 de marzo de 1953

El pleito fue trasladado a la Sala de San Juan del Tribunal de Distrito. Florencio Vélez Maldonado no compareció en el mismo y se le anotó su rebeldía. La Hull-Dobbs Co. of Puerto Rico y Cecilio Montalvo contestaron conjuntamente la demanda aceptando parte de los hechos alegados en la misma, negando los demás y formulando varias defensas especiales. (³)

Se celebró el juicio; el Tribunal de Distrito dictó sentencia declarando sin lugar la demanda contra Hull-Dobbs Co. y Cecilio Montalvo, y con lugar en cuanto a Florencio Vélez Maldonado. (⁴)

Apeló el demandante al Tribunal Superior, Sala de San Juan, señalando como único error el no haber aplicado el Tribunal de Distrito "a los hechos del caso las disposiciones de la Ley Hipotecaria Sobre Propiedad Mueble."

el codemandado Cecilio Montalvo, teniendo conocimiento de dicha hipoteca en igual forma adquirió la referida propiedad hipotecada por compra de la codemandada Hull-Dobbs Co. of Puerto Rico.

"5º Que la propiedad hipotecada tenía al tiempo de su adquisición por la codemandada Hull-Dobbs Co. of Puerto Rico un valor de $1,800.00, y que ninguno de los demandados ha satisfecho al demandante dicho valor ni en todo ni en parte no obstante las gestiones del demandante.

"POR TODO LO CUAL, el demandante al Hon.. Tribunal SUPLICA se sirva declarar con lugar esta demanda y *condenar a los demandados a pagar solidariamente al demandante la cantidad de $1,800.00* con más las costas de este pleito incluyendo honorarios de abogado." (Itálicas nuestras.)

(³) Las dos últimas de esas defensas dicen así:

"2.—Alegan además que antes de que surja una causa de acción a favor del demandante y contra estos demandados, el demandante tiene que haber agotado todos los recursos para cobrar su hipoteca y resultar infructuosas sus gestiones a tales efectos para que pueda surgir una causa de acción a su favor y contra estos demandados.

"3.—*Que los demandados comparecientes han conseguido la propiedad mueble hipotecada al demandante, según se alega, y por la presente están dispuestos a entregársela al demandante para que éste ejecute su hipoteca,* siempre y cuando demuestre que es dueño de una hipoteca válida sobre dicho bien y a condición de que queden los demandados comparecientes relevados del presente pleito." (Itálicas nuestras.)

(⁴) En cuanto a la responsabilidad de los dos primeros demandados se expresó así el Tribunal de Distrito:

"Para que exista la conversión que obliga al comprador a pagar al acreedor hipotecario el importe del valor de la propiedad al momento de la transferencia es necesario que el comprador, por un acto de él, ponga en

El día 10 de julio de 1956 el Tribunal Superior resolvió que se había cometido el error señalado y dictó sentencia por la cual revocó el fallo del Tribunal de Distrito en tanto y en cuanto exoneraba de responsabilidad a la Hull-Dobbs Co. y a Cecilio Montalvo y declaró con lugar la demanda condenando a estos dos demandados a pagar al demandante la suma de $900 por "concepto de daños y perjuicios" más $350 por concepto de honorarios de abogados y las costas. Posteriormente se negó a reconsiderarla.(5)

A petición de Hull-Dobbs Co. of Puerto Rico y Cecilio Montalvo libramos un auto de certiorari para revisar la sentencia del Tribunal Superior.

Sostienen los peticionarios que cometió error el Tribunal Superior demandado (a) al resolver que ocurrió una conversión de bienes muebles hipotecados que impidió que a su vencimiento el demandante ejecutara su hipoteca, y (b) al revocar la sentencia del Tribunal de Distrito basándose en que la acción ejercitada por el demandante era una de daños y perjuicios.

---

peligro o destruya el gravamen en tal forma que resulte que el acreedor ha perdido el control sobre la propiedad hipotecada. En el caso de autos, por el contrario, los demandados le han ofrecido al demandante entregarle el bien hipotecado para que ejecute su hipoteca y cobre su crédito, así es que no ha ocurrido ningún acto de los demandados de tal naturaleza, y por lo tanto procede que se desestime la demanda en cuanto a los demandados Hull-Dobbs Co. of P. R. y Cecilio Montalvo."

Aunque en sus conclusiones el Tribunal de Distrito determinó las sumas que adeudaba Vélez Maldonado al demandante, sin embargo, al dictar su sentencia a continuación de sus conclusiones, en cuanto a él, solamente decretó: " . . . y con lugar en cuanto al demandado Florencio Vélez Maldonado."

Con frecuencia se preparan y dictan las sentencias finales a continuación de la declaración de hechos probados y conclusiones de derecho. No debe continuarse esta práctica. Toda sentencia final debe prepararse y dictarse en documento separado. Así se facilita mejor su registro y ejecución, la expedición de copias y las enmiendas y correcciones tanto a la declaración de hechos probados y conclusiones de derecho como a la propia sentencia. Véanse Reglas 43.1, 43.2, 44.2 y 46 de Procedimiento Civil. 32 L.P.R.A., Supl. Acum. 1958 Ap.

(5) El Tribunal Superior, en parte, se expresó así:

"Los daños sufridos por el demandante indudablemente fueron causados por actuaciones de la demandada Hull Dobbs Co., primero, al adquirir el

El Tribunal Superior cometió el primer error señalado. Ni ocurrió conversión alguna del automóvil hipotecado, ni los peticionarios impidieron al acreedor hipotecario la ejecución de su garantía.

I

▆▆▆ Entre las diversas acciones que el derecho de propiedad angloamericano reconoce al titular de una cosa se encuentra la de *trover* o *trover and conversion*. Procede para reclamar los daños y perjuicios causados por cualquier persona que ilegalmente prive a otra del dominio o uso de un bien mueble que tenga el actor en su poder a título de propietario o de simple poseedor. Su objetivo no es recuperar la posesión del mueble ni reivindicarlo, sino obligar al detentador ilegítimo a pagar su valor íntegro, aun en el caso de estar dispuesto a devolverlo. La médula de la figura jurídica de la conversión no es la simple adquisición de la propiedad ajena, sino la maliciosa e ilícita privación de los derechos de posesión, el ejercicio ilegal o la asunción de autoridad sobre bienes ajenos

---

bien mueble estando hipotecado en el registro de la propiedad y, segundo, al traspasarlo a una tercera persona, en este caso, Cecilio Maldonado (sic).

"El demandante fue diligente al gestionar la ejecución de la hipoteca conforme determina la ley. El hecho de no haberla podido ejecutar se debió a que el automóvil había sido traspasado a la Hull Dobbs Co. Oportunamente el demandante se dirigió a la demandada informándole que el automóvil adquirido por ella estaba gravado con una hipoteca. Si la demandada quería liberarse de su responsabilidad frente al demandante debió haber hecho un ofrecimiento de sentencia montante al valor del automóvil al momento de la conversión.

"La regla es que bajo la ley de hipotecas de bienes muebles el acreedor hipotecario viene a ser el dueño de los bienes en el sentido de que tiene título legal, quedando al deudor hipotecario el derecho a retener la posesión y disfrute de las ventajas que se derivan de su uso y a cancelar el título del acreedor hipotecario por medio del cumplimiento de los términos de la escritura de hipoteca. En cierto sentido el acreedor hipotecario es en derecho el dueño y el deudor hipotecario es el dueño en equidad. Así lo interpretó nuestro más alto tribunal en el caso de *United Porto Rican Bank* v. *González*, 46 D.P.R. 781, a la página 786, citando el caso de *Bachrach* v. *Mantel*, 25 J. F. 422.

"Para garantizar ese derecho que le concede la ley al acreedor hipotecario, como antes hemos dicho, en la sección 10 expresamente se prohíbe la venta, pignoración, etc., de bienes gravados con hipotecas de bienes muebles."

privando al legítimo dueño o poseedor, permanentemente o por tiempo indefinido de su goce y disfrute. (⁶)

En el ámbito de la conversión norteamericana se le atribuye diferentes efectos a la mera venta o transferencia de un bien mueble hipotecado dependiendo de las tendencias legislativas o jurisprudenciales del sistema hipotecario de los diversos estados de la Unión. En el grupo de estados que, siguiendo los principios de la ley común inglesa, se adhiere a la teoría de que la hipoteca mobiliaria constituye una venta absoluta de la cosa hipotecada a favor del acreedor pasando a éste el título sobre el mueble y que el deudor sólo retiene un derecho de redención—*title theory states*—y en aquéllos que así la consideran tan pronto como el deudor no paga el importe del préstamo—*intermediate theory states*—la venta, no

---

(⁶) Originalmente procedía esta acción cuando una persona perdía un bien mueble de su propiedad y éste era encontrado por otra persona, quien al ser requerida por el dueño se negaba a devolverlo, "convirtiéndolo" indebidamente en un objeto de su propio uso. Como el hecho original de encontrar el objeto no era un acto ilícito, la base de la acción consistía en la retención indebida de la cosa ajena, y puesto que el demandado se la apropiaba indebidamente después de ser requerido por el dueño para que la restituyera, mediante esta acción se le obligaba a pagar el valor de la cosa retenida contra la voluntad del dueño, lo que equivalía a convertirlo en un comprador forzoso. Oscar Rabassa: El Derecho Angloamericano, México, 1944, pág. 146.

La voz *conversión* en nuestro Derecho tiene una significación distinta. Es la transformación de un acto que siendo nulo en cuanto represente un negocio jurídico determinado, se considera válido si contiene todos los elementos esenciales y formales de otro tipo de negocio. La sustitución del negocio nulo por otro válido dimana de la tendencia del Derecho a negar la nulidad y a no otorgar ineficacia a los actos jurídicos, siempre que sea posible, en respeto a las declaraciones de voluntad y considerando el fondo y lo sustancial del acto. Casos de conversión en nuestro Código Civil los encontramos en sus arts. 665 y 1176. Justifica el fenómeno de la conversión, entre otros principios, el art. 1210 de ese código, a virtud del cual el contrato obliga no sólo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza sean conformes a la buena fe, al uso y a la ley. Véanse, Clemente de Diego: Instituciones de Derecho Civil Español Común y Foral, 9na. ed., tomo 1, vol. 2, Madrid, 1955, pág. 694; Luis Riera Aísa: Conversión del Negocio Jurídico, monografía publicada en el tomo V, págs. 713–718, Nueva Enciclopedia Jurídica Española; P. Oertman: Invalidez e Ineficacia de los Negocios Jurídicos, trabajo publicado en el tomo XVI, págs. 65–80 de la Revista de Derecho Privado, 1929.

consentida por el acreedor o subrepticia, hecha por el deudor hipotecante a favor de un tercero se considera nula por constituir una apropiación ilícita de la propiedad de aquél. El grupo de estados que, siguiendo los principios de equidad, ha optado por la doctrina de que la hipoteca sólo crea un derecho real de garantía (*lien*) sobre la cosa hipotecada, con exclusión de toda idea de transferencia de propiedad o posesión a favor del acreedor, y que considera la inscripción de la hipoteca como un equivalente a la posesión material de la cosa gravada —*lien theory states*—reconoce entera libertad al deudor hipotecante para vender el bien mueble gravado a tercera persona, quien lo recibe sujeto a la hipoteca inscrita y únicamente acepta que existe una conversión cuando el adquirente, maliciosa o fraudulentamente, en perjuicio de los derechos e intereses del acreedor, oculta la cosa gravada, la destruye, la deteriora o le causa desperfectos serios, altera sustancialmente su naturaleza, la mezcla con otras para impedir su identificación, la remueve o traslada fuera del alcance del acreedor, o realiza intencionalmente cualquier otro acto que impida al acreedor la defensa, conservación o efectividad del crédito y su garantía. [7]

A pesar de que varios estados del primer grupo siguen adhiriéndose a la teoría del traspaso del título, se observa, especialmente en los estados del oeste—Cf. *Edge* v. *Smith*, 284 P.2d 711 (1955), 53 A.L.R.2d 929, 933—una creciente tendencia a considerar la hipoteca sobre bienes muebles como una garantía o seguridad para el acreedor. La ficción del traspaso del título va diluyéndose a medida que se aprueban estatutos proveyendo otras protecciones para asegurar la efectividad de las hipotecas.

En las primeras decisiones del estado de California prevaleció la teoría de la transferencia del título y posesión a

---

[7] Jones: *Chattel Mortgages and Conditional Sales* (Bowers ed.), Vol. 2, págs. 3–5; Osborne: *The Law of Mortgages*, págs. 31, 32; Glen, *Mortgages*, Vol. 2, pág. 1131; Puig Brutau: Estudios de Derecho Comparado, pág. 96; Muñoz Morales: Lecciones de Derecho Hipotecario, Vol. II, págs. 334–336.

favor del acreedor hipotecario. (8)    Pero a partir de su codificación la rechazó y adoptó legislativamente la teoría del gravamen (*lien*).    En los arts. 2872, 2877, 2888 y 2889 de su Código Civil de 1872 caracterizó la hipoteca como un contrato de garantía o seguridad; dispuso que no obstante pacto en contrario un gravamen o una promesa para constituirlo, nunca transferiría el título sobre la cosa sujeta al gravamen y prohibió el pacto de comiso.    Su jurisprudencia posterior invariablemente ha sostenido que la hipoteca *"is a mere lien or security for the payment of money, and does not convey any title to the mortgagee."* (9)

Como hemos consignado, el Tribunal Superior resolvió que se produjo una conversión de bienes en el momento en que la Hull-Dobbs Co. compró a Florencio Vélez Maldonado el automóvil hipotecado y que "los daños sufridos por el demandante indudablemente fueron causados por actuaciones de la demandada Hull-Dobbs Co., primero, al adquirir el bien mueble estando hipotecado en el registro de la propiedad y, segundo, al traspasarlo a una tercera persona."    Fundamentó su decisión en aquella parte de nuestra opinión en el caso de *United Porto Rican Bank* v. *González*, 46 D.P.R. 781, 786 (1934) que dice así:

". . . De otra suerte, *teniendo en cuenta la historia de las hipotecas sobre bienes muebles*, nos hubiéramos visto obligados a decidir que el embargo no hubiera podido ni siquiera trabarse.

---

(8) *Hackett* v. *Manlove*, 14 Cal. 85; *Fogarty* v. *Sawyer*, 17 Cal. 589; *Wilson* v. *Brannan*, 27 Cal. 258; *Woods* v. *Bugbey*, 29 Cal. 467; *Polhemus* v. *Trainer*, 30 Cal. 686; *Heyland* v. *Badger*, 35 Cal. 404; *Wright* v. *Ross*, 36 Cal. 414.

(9) *Harp* v. *Calahan*, 46 Cal. 222 (1873); *Breedlove* v. *Norwich Union Fire Ins. Soc.*, 124 Cal. 164 (1899); *Summerville* v. *Stockton Milling Co.*, 142 Cal. 529 (1904); *Booker* v. *Castillo*, 154 Cal. 672 (1908); *Flores* v. *Stone*, 21 Cal. App. 105 (1913); *Chapman* v. *Hicks*, 41 Cal. App. 158 (1919); *Johnson* v. *Razy*, 181 Cal. 342 (1919); *Diggs* v. *Pacific Gas & Electric Co.*, 57 Cal. App. 57 (1922); *Pacific Finance Corp.* v. *Hendley*, 119 Cal. App. 697 (1932); *Chapman* v. *Great Western Gypsum Co.*, 216 Cal. 420 (1932); *Jolly* v. *Thornton*, 40 Cal. App.2d (Supp.) 819 (1940); *Heuer* v. *Truck Ins. Exchange*, 51 Cal. App.2d 497 (1942); *Priddel* v. *Shankie*, 69 Cal. App.2d 319 (1945). Véase ·10 Cal. Jur.2d, *Chattel Mortgages*, secs. 42–47.

Véase Jones, *Chattel Mortages* (5ta. ed.) págs. 1 a 2, y 752 a 753, y lo que dice la Corte Suprema de Filipinas en el caso de *Bachrach* v. *Mantel*, 25 J. F. 422, como sigue:

" '*Según la Ley Hipotecaria de Bienes Muebles*, el acreedor hipotecario viene a ser el dueño de los bienes en el sentido de que tiene el título legal, quedando al deudor hipotecario el derecho a retener la posesión, a disfrutar de las ventajas que se derivan de su uso y a cancelar el título del acreedor hipotecario por medio del cumplimiento de los términos de la escritura de hipoteca. En cierto sentido, el acreedor hipotecario es en derecho el dueño (*legal owner*), y el deudor hipotecario es el dueño en equidad (*equitable owner*).' " (Énfasis nuestro.)

De lo que en tal forma en ese caso dijimos no se puede afirmar que entonces adoptamos la teoría del título del Derecho norteamericano. Simplemente hicimos relación a "la historia de las hipotecas sobre bienes muebles" dentro de ese Derecho y a lo decidido por la jurisprudencia filipina "según la Ley Hipotecaria de Bienes Muebles" vigente en las Islas Filipinas desde el primero de agosto de 1906.[10]

A la adopción se oponía, como sigue oponiéndose, la ley nuestra sobre la hipoteca mobiliaria, núm. 19, aprobada el 3 de junio de 1927. Ella está inspirada en nuestra concepción tradicional de la naturaleza de los contratos de prenda e hipoteca, o sea, que, fundamentalmente, no son nada más que contratos accesorios a virtud de los cuales se constituye un gravamen sobre determinados bienes para la seguridad y garantía de una obligación propia o ajena, sin trasmitir al acreedor ningún título de dominio sobre los mismos. En su sec. 3, —tanto conforme a su texto original de 1927 como al

---

[10] La Ley Hipotecaria de Bienes Muebles de las Islas Filipinas es también de origen norteamericano. Se aprobó el 2 de julio de 1906, y entró en vigor treinta días después. Contiene varias disposiciones análogas a nuestro estatuto de 1927 sobre la materia. Pero en parte de sus preceptos trasplantó al archipiélago la teoría del título. Su art. 3 dispone:

"Art. 3.—Una hipoteca de bienes muebles *es una venta condicional de los mismos* como garantía del pago de una deuda, o del cumplimiento de alguna otra obligación especificada en la misma, siendo la condición que *la venta* será nula mediante el pago por el *vendedor al comprador* de una cantidad de dinero o llevando a cabo algún otro acto mencionado. Si la condición se lleva a cabo según sus términos *la hipoteca y venta* quedan inmedia-

que actualmente tiene después de la enmienda que se le hizo por la Ley núm. 57 de 10 de junio de 1955, que introdujo en el estatuto la denominación de "hipoteca mobiliaria"—se define la hipoteca como un gravamen para "garantizar el cumplimiento de cualquier obligación." En el modelo de hipoteca las partes hacen constar que el gravamen se otorga a favor del acreedor en garantía de tal o cual obligación y el deudor hipotecante afirma bajo juramento "que la precedente hipoteca se otorga con el fin de garantizar las obligaciones especificadas en ella y con ningún otro fin. . . ."

Sin embargo, en la reconsideración del caso de *Araújo v. Arenas*, 60 D.P.R. 284, 300 (1942), nos apartamos de la letra y espíritu de nuestro estatuto sobre la materia, de los principios que informan nuestro sistema hipotecario, de la interpretación constante de la jurisprudencia de California sobre la naturaleza de la hipoteca de bienes muebles, y apoyándonos precariamente en la mención histórica que hicimos en el caso de *United Porto Rican Bank v. González,* supra, y lo dicho por la Corte Suprema de Filipinas en el caso de *Bachrach,* acogimos sin reserva alguna la teoría del título de la ley común angloamericana, diciendo:

"La previa consignación *está en armonía con la naturaleza intrínseca de la hipoteca sobre bienes muebles, de acuerdo con la cual el acreedor hipotecario se convierte, hasta cierto punto, en dueño de la propiedad hipotecada.* En el mismo caso de *United Porto Rican Bank v. González,* supra, se citó al efecto, el siguiente extracto del caso de *Bachrach v. Mantel,* 25 J. F. 422, resuelto por la Corte Suprema de Filipinas:

---

tamente anuladas, y el acreedor hipotecario queda en su consecuencia privado *de su título.*" (Énfasis nuestro.)

En el modelo de hipoteca que provee su art. 5 se dice:

"Que el citado deudor hipotecario por la presente *traspasa* e hipoteca al mencionado acreedor hipotecario todos los bienes muebles que a continuación se describen, . . . ." (Énfasis nuestro.)

Interpretando esas disposiciones la Corte Suprema de Filipinas en *Meyers v. Thein,* 15 Jur.Fil. 313, *Rosales v. Reyes,* 25 Jur.Fil. 511, *Bachrach v. Mantel,* 25 Jur. Fil. 422 y *Mahoney v. Tuason,* 39 Jur. Fil. 976, resolvió que por obra de esa Ley Hipotecaria de Bienes Muebles el contrato real de prenda del Código Civil filipino había degenerado en otro consensual de venta con pacto de retro de suerte que mientras existe la hipoteca, el do-

" 'Según la Ley Hipotecaria de Bienes Muebles, el acreedor hipotecario viene a ser dueño de los bienes en el sentido de que tiene el título legal, quedando al deudor hipotecario el derecho de retener la posesión, a disfrutar de las ventajas que se derivan de su uso y a cancelar el título del acreedor hipotecario por medio del cumplimiento de los términos de la escritura de hipoteca. En cierto sentido, el acreedor hipotecario es en derecho el dueño (*legal owner*), y el deudor hipotecario es el dueño en equidad (*equitable owner*).'

"Teniendo Arenas, acreedor hipotecario, *el título legal sobre el automóvil,* no pudo adquirir Francisco título legal alguno sobre el mismo que pudiera a su vez traspasar a otros, por no haber consignado el importe de la hipoteca."   (Énfasis nuestro.)

Pocos años más tarde el maestro don Luis Muñoz Morales comentando el texto de esa ley y la decisión del caso de *Araújo* en su obra Lecciones de Derecho Hipotecario, tomo II, página 338, se expresó así:

"En su consecuencia, y ateniéndonos a su texto, podemos sostener que, según esta ley, *no se trasmite al acreedor* ningún título de propiedad sobre los muebles hipotecados, que permanecen en poder del deudor como dice el formulario de la sección 5; y solamente se constituye un *gravamen* (*lien*).

"Por otra parte el Código Civil de California en su art. 2872 define el *lien* diciendo: '*A lien is a charge imposed in some mode . . . upon specific property by which it is made security for the performance of an act';* y después en el art. 2888, refiriéndose a sus efectos, dice: '*Notwithstanding an agreement to the contrary, a lien, or a contract for a lien, transfers no title to the property subject to the lien.*'

"En resumen, ese gravamen según la técnica jurídica, no es otra cosa que una limitación del ejercicio de propiedad, pero no una desmembración o transferencia de tal derecho; sólo constituye una preferencia respecto a cualesquiera otra reclamación

---

minio de los bienes muebles hipotecados se halla en manos del acreedor pignoraticio desde la inscripción de la hipoteca en el registro y ya los bienes muebles dejan de ser del deudor por haber pasado a ser del acreedor, como pasa al comprador el dominio de la cosa vendida que deja de ser del vendedor desde el momento de la entrega, por efecto de la venta.

En el caso de *Bachrach,* supra, aplicando esos principios en unión a otras razones, se obligó a un acreedor hipotecario a satisfacer el importe de unas reparaciones hechas a unos automóviles hipotecados.

o deuda que quiera hacerse efectiva sobre la propiedad gravada, siempre que tal hipoteca esté debidamente inscrita, y así lo reconoce expresamente el Código Civil de California en sus artículos 2968 al 2970. Y por esto, salvo el respeto debido, no nos parece muy ajustado el criterio de nuestro Tribunal Supremo de Puerto Rico cuando en el caso de *Araújo* v. *Arena,* 60–289, resuelto en 11 de abril de 1942, dice que en las hipotecas de bienes muebles los acreedores hipotecarios son los dueños en derecho (*legal owners*) de esos muebles, siendo los deudores meros dueños en equidad (*equitable owners*)."

Por las anteriores razones y en cuanto al punto aquí tratado deben entenderse revocados los casos de *United Porto Rican Bank* v. *González,* 46 D.P.R. 781 y *Araújo* v. *Arenas,* 60 D.P.R. 284. Aunque la cirugía judicial para extirpar precedentes erróneos debe practicarse con cautela, creemos que ambos casos, en cuanto a la aplicación en Puerto Rico de la doctrina del traspaso del título, no deben subsistir. Cf. *Pueblo* v. *Torres,* 80 D.P.R. 245, 246 (1958).

▆▆▆▆ ¿Es nula la venta del automóvil hipotecado que hizo el deudor hipotecante a la Hull-Dobbs Co. y la que ésta a su vez hizo a Cecilio Montalvo, por no haberlas consentido el acreedor hipotecario? El único obstáculo para una respuesta negativa lo presenta la sec. 10 de la Ley núm. 19 al disponer que "Ningún deudor hipotecario de propiedad mueble venderá . . . propiedad hipotecada por él . . . sin el consentimiento por escrito del acreedor hipotecario." Ese obstáculo no es infranqueable. Tal precepto y el castigo que por su infracción la propia ley impone al deudor hipotecante no tienen otra finalidad que la de proteger al acreedor hipotecario evitando la intervención de terceras personas en la relación crediticia y a quienes les fuera indiferente la conservación, cuidado y mantenimiento del valor del bien mueble hipotecado. La ley no declara nula la venta en esas condiciones. La hipoteca, una vez inscrita, es válida contra toda persona. Hemos dicho que su inscripción es una notificación de la existencia del gravamen a todos, residan o no dentro del distrito en que reside

el deudor.([11])   Nadie puede alegar ignorancia del contenido registral.   El prohibirse al deudor la venta puede afectar la licitud de la transmisión pero no alcanza a su validez.([12])

A la garantía mobiliaria no se le priva de reipersecutoriedad por el solo hecho de que la cosa gravada pase a poder de terceras personas.   Conforme a la sec. 14 de la ley el acreedor, una vez vencida y no pagada la obligación principal, puede hacer que de la propiedad se incaute el alguacil del distrito "en donde se encontrare la propiedad", y la venda en pública subasta, notificando al deudor "o a la persona en posesión o a cargo de la propiedad."([13])

---

([11]) *Araújo* v. *Arenas,* supra; *United Porto Rican Bank* v. *González,* supra; *United Porto Rican Bank* v. *Ruiz,* 43 D.P.R. 528 (1932).   10 Am. Jur., *Chattel Mortgages,* sec. 191; 10 Cal. Jur.2d, *Chattel Mortgages,* sec. 36.

([12]) En California se ha decidido que la infracción por el deudor hipotecante de la disposición penal que le prohibe vender no impide que la propiedad hipotecada pase a poder del comprador, bien sujeta al gravamen o bien libre de él, según las circunstancias del caso.   *Reno* v. *Boyden (A.L.) Co.,* 115 Cal. App. 697, 2 P.2d 214; *Schwartzler* v. *Lemas,* 11 Cal. App.2d 442, 53 P.2d 1039.   La regla general en ese estado es que el deudor puede venderla sujeta al gravamen.   10 Cal. Jur.2d, *Chattel Mortgages,* sec. 64.

En el estudio de la hipoteca mobiliaria publicado por el jurista español Juan Vallet de Goytisolo, en la Revista de Derecho Privado, tomo XXXVII (1953) págs. 539-540, se dice:

"Por ello estimamos que—salvo pacto en contrario—debe prohibirse la transmisión sin autorización del acreedor de los bienes sujetos a hipoteca mobiliaria o prenda sin desplazamiento.

"Ahora bien; esas prohibiciones sólo deben afectar a licitud de la transmisión sin alcanzar a su validez.   Pueden dar lugar a responsabilidad personal, civil y criminal del transferente y provocar el vencimiento del crédito.   Pero, sin invalidar la transmisión.

"Hay serias razones que justifican este criterio.

"En la hipoteca, el objeto gravado seguirá sujeto cualquiera que sea su titular o poseedor.   En la prenda sin desplazamiento, las necesidades del comercio imponen la solución contraria siempre que el adquirente hubiera obrado de buena fe.   En la primera no hace falta, por tanto, invalidar la transmisión; en la segunda no es posible declararla nula sin atentar contra el interés general que reclama la debida protección de la circulación jurídica mobiliaria."

([13]) A pesar de esas disposiciones, nuestra Ley núm. 19 de 1927, que le dio vida a un instrumento tan importante de crédito moderno como es la hipoteca mobiliaria, padece de muchas imprecisiones, de impropiedades y defectos técnicos.   Nos parece que no se enfocó su creación con una amplia

Repetidamente hemos reconocido validez y eficacia a las subsiguientes ventas e hipotecas de bienes muebles y semovientes realizadas o constituídas por compradores condicionales antes de satisfacer totalmente el precio de su adquisición condicional, no obstante la reserva del dominio que la Ley núm. 61 de 1916 autoriza a favor del vendedor condicional hasta que dichos bienes hayan sido pagados en su totalidad, quedando sujetas las posteriores ventas o hipotecas a las mis-

visión de los problemas civiles, hipotecarios y comerciales relativos a su naturaleza jurídica, a la seguridad del crédito y al tráfico jurídico. Dos meses después de su aprobación, el entonces Director de la Comisión Codificadora, el propio Muñoz Morales, sometió a la Legislatura un interesante informe en torno a este estatuto en el que se expresaba, en parte, así:

". . . y nos parece que esta nueva ley en la forma que está redactada no viene a llenar ninguna necesidad para facilitar el crédito, y antes al contrario, acaso vendrá a provocar dificultades en la práctica por las deficiencias que a nuestro modo de ver contienen sus preceptos."

En ese informe apuntaba treinta y una cuestiones "que surgen al aplicar esta ley", entre ellas la constitucionalidad del procedimiento para el cobro de la hipoteca, sobre el cual opina que no concede al deudor su día en corte ni se actúa bajo poder judicial alguno. Terminaba el mismo con el siguiente párrafo: "Nuestra opinión en definitiva, y protestando siempre nuestro más profundo respeto a la Asamblea Legislativa, es que esta Ley, lejos de facilitar el crédito, podrá traer complicaciones y dificultades en su aplicación."

Evidencia de que las ha traído se encuentra en los siguientes casos: *García* v. *Registrador*, 70 D.P.R. 58 (1949); *López* v. *Registrador*, 66 D.P.R. 170 (1946); *Álvarez* v. *Registrador*, 64 D.P.R. 40 (1944) y *Arroyo* v. *Registrador*, 57 D.P.R. 183 (1940), en todos los cuales resolvimos que esa ley no autoriza la constitución de hipotecas sobre bienes muebles en garantía de pagarés al portador. La enmienda que se le hizo a la sec. 10 por la Ley núm. 71 de 1930, que es una protección para el acreedor, y las que se hicieron por la Ley núm. 57 de 1955 a sus secs. 3 y 5, que tienden a proteger al deudor hipotecante, en nada han corregido las deficiencias originales del estatuto.

En 1941 España intentó una regulación del contrato de prenda sin desplazamiento, añadiendo al Código Civil los arts. 1863 bis a 1873 bis. Esta reforma no tuvo en la práctica el desarrollo y la aplicación deseados. Con el propósito de perfeccionar la hipoteca mobiliaria como instrumento crediticio, el 16 de diciembre de 1954 allí se aprobó una extensa y minuciosa ley titulada "Hipoteca Mobiliaria y Prenda Sin Desplazamiento" que en *noventa y cinco* artículos, de *magistral redacción*, regula, en *todos sus* posibles aspectos, esas figuras jurídicas. En ella se autoriza la constitución de la hipoteca mobiliaria en garantía de títulos al portador o transmisibles por endoso. Cf. Enciclopedia Jurídica Española, Apéndice de 1954, págs. 580–592.

mas condiciones del contrato de venta condicional primitivo que hubiera sido debidamente inscrito.[14]

En la demanda radicada por el acreedor hipotecario Amado Vega no se alegó que existiera mala fe en las ventas de Florencio Vélez a Hull-Dobbs Co. y de ésta a Cecilio Montalvo. La prueba no la establece. Ambos resultaron ser meros compradores de un automóvil hipotecado. Nada hay en dicha prueba que demuestre que ambos o cualquiera de ellos lo ocultaran o pusieran fuera del alcance del procedimiento que fija la ley para la ejecución de hipotecas de bienes muebles, o que lo destruyeran, o causaran desperfectos, ni que no atendieran a su conservación y mantenimiento como un buen padre de familia, que lo hicieran depreciar por otras causas distintas a su uso prudente o al mero transcurso del tiempo, o que voluntaria y maliciosamente perjudicaran la garantía hipotecaria que lo gravaba. La Hull-Dobbs Co. lo adquirió y vendió mucho antes de vencerse la obligación principal asegurada por la hipoteca. Tampoco se alegó o probó que ambos compradores o cualquiera de ellos (a) asumiera el pago de la deuda hipotecaria, (b) retuviera del precio de adquisición el importe de la deuda para entregarlo al acreedor, o (c) que el monto de la hipoteca formara parte del precio de cada compra. Bajo estas circunstancias nunca surgió responsabilidad personal de parte de ellos para el pago del crédito hipotecario, ni aun por la deficiencia resultante en el cobro del crédito por el procedimiento especial regulado por la Ley de 1927 ni tampoco una acción de daños y perjuicios por la alegada conversión.[15] Al vencerse el crédito el acreedor

---

[14] *National Cash Reg. Co.* v. *Berdeguez*, 37 D.P.R. 158 (1927); *Arenas* v. *Batalla, y Francisco, Int.*, 48 D.P.R. 31 (1935); *Smallwood* v. *Corte*, 50 D.P.R. 634 (1936); *León* v. *Corte*, 52 D.P.R. 892 (1938); *Chase National Bank* v. *Colón*, 56 D.P.R. 297 (1940).

[15] La asunción de una deuda debe ser pacto expreso.—Arts. 1158 y 1162, Cód. Civil; *Soto* v. *Feliciano*, 80 D.P.R. 615, 618 (1958); *Treuer* v. *Holtzman*, 262 N. W. 369 (Mich. 1935); 100 A.L.R. 1036; anotación a las páginas 1038–1044; Jones, obra y edición citadas, vol. 2, pág. 263, sec. 489, y suplemento de 1956, pág. 91, sec. 490a.

Por regla general, los contratos sólo producen efecto entre las partes que los otorgan y sus herederos—art. 1209, Cód. Civil—; tanto la Hull-

tenía dos caminos a seguir: el del cobro personal ordinario contra su deudor original Florencio Vélez Maldonado, o el del procedimiento para la ejecución de la garantía hipotecaria contra la cosa gravada en poder entonces de Cecilio Montalvo. Si para esa fecha la Hull-Dobbs Co. no era la dueña o poseedora del automóvil hipotecado, y si ella en nada había perjudicado la garantía hipotecaria, ninguna acción contra la misma tenía el acreedor hipotecario.

La jurisprudencia establecida en los casos de *United Porto Rican Bank* v. *Ruiz*, 43 D.P.R. 528 (1932) y *United Porto Rican Bank* v. *González*, 46 D.P.R. 781 (1934) no es de aplicación al presente caso, si bien en ambos aplicamos la doctrina de la conversión a la luz de las circunstancias específicas concurrentes en cada uno de ellos. En el primero de ellos el banco demandante hizo un préstamo a favor de una persona que garantizó su pago mediante hipoteca que otorgó sobre dieciocho bueyes, inscribiéndose la hipoteca; el deudor vendió dieciséis de los diociocho bueyes hipotecados a una sociedad la que posteriormente hizo matar los bueyes para venderlos como carne. Resolvimos que los actos de la compradora constituían una conversión y que la sociedad venía obligada a pagar el valor de los bueyes sacrificados. En el caso de *González* se hipotecaron cuarenta y un bueyes que se encontraban en el Municipio de Gurabo, inscribiéndose la hipoteca en el Registro de la Propiedad de Caguas; en pleito seguido por

---

Dobbs Co. como Cecilio Montalvo se convirtieron en dueños de algo gravado que podían perder como resultado del cobro de la hipoteca. Hasta cierto punto, al comprar voluntariamente el automóvil resultaron obligados para con el acreedor hipotecario—art. 1787, Cód. Civil. Pero ninguno de ellos contrajo personalmente la obligación original, ni sustituyó para todos los fines al deudor hipotecante respecto al pago de esa obligación. La responsabilidad de ellos sólo se extendió hasta donde alcanzara el producto de la venta en pública subasta de la cosa hipotecada, sin que pudiera hacerse efectivo sobre sus bienes propios cualquier saldo no cubierto por la venta. Cf. *Hilario Santos* v. *Morán,* 32 D.P.R. 59 (1923); *Trueba* v. *Rosales & Cía.,* 33 D.P.R. 1027, 1031 (1925); *Molina* v. *Pascual,* 42 D.P.R. 668, 673 (1931); *Trautmann* v. *P. R. Ore Co.,* 46 D.P.R. 775, 777 (1934); *López Cepero* v. *Sierra,* 49 D.P.R. 345, 347 (1935); *Torres* v. *Fernández,* 65 D.P.R. 622, 630 (1946); *Cruz* v. *Registrador,* 69 D.P.R. 536 (1949).

una tercera persona contra el deudor hipotecante fueron embargados treinta de los cuarenta y un bueyes hipotecados; se obtuvo sentencia en rebeldía contra el demandado; se nombró un depositario de los bueyes embargados, ordenándose el traslado de veinte de éstos, a pesar de la oposición del acreedor hipotecario, al distrito de San Juan; estando en poder del depositario diez de los treinta bueyes embargados perecieron con motivo del ciclón de San Felipe; en la ejecución de la sentencia se vendieron los veinte bueyes trasladados a San Juan, en pública subasta, sin notificar ésta al acreedor ni darse a conocer en los anuncios de subasta que los bueyes estaban embargados, apropiándose la demandante del total del importe de la venta.   Resolvimos que la parte demandante en la acción en que se embargaron los bueyes los había convertido en suyos a virtud del embargo y venta, revocamos la sentencia que la absolvía de responsabilidad para con el acreedor hipotecario y la condenamos al pago a éste del valor de los treinta bueyes embargados.

## II

Determinó el Tribunal Superior que "el demandante fue diligente al gestionar la ejecución de la hipoteca" y que "el hecho de no haberla podido ejecutar se debió a que el automóvil había sido traspasado a la Hull-Dobbs Co."   Consideramos erróneas esas conclusiones.

El demandante, antes de iniciar la ejecución no ignoraba el paradero del automóvil hipotecado.   Tanto el traspaso hecho en 24 de febrero de 1953 a la Hull-Dobbs Co. como el hecho en 1ro de marzo de 1953 por ésta a favor de Cecilio Montalvo habían sido registrados en la División de Vehículos de Motor.   Su deudor, Vélez Maldonado, dos meses después de constituirse la hipoteca, le había informado que le había vendido el carro a la Hull-Dobbs.

Ni como cuestión de hecho, ni de derecho, las dos ventas habían hecho imposible el recobrar la posesión del automóvil hipotecado.   Antes de comenzar el procedimiento se le había

ofrecido su entrega.(¹⁶)    Desechó ese ofrecimiento y comenzó
la ejecución requiriendo al alguacil de la Sala de San Germán
para que tomara "posesión inmediata de la propiedad" sin
darle información alguna del sitio cierto en que el automóvil
hipotecado se hallaba entonces ni de los traspasos del vehículo
posteriores a la constitución del gravamen.    Sin que funcio-
nario alguno previamente requiriera a la Hull-Dobbs Co. o a
Cecilio Montalvo para la entrega de la posesión del automóvil,
y en el mismo día en que el alguacil devuelve el documento de
requerimiento negativamente diligenciado, radicó su demanda
de daños y perjuicios contra éstos, cobrándoles, no el importe
de su crédito, o sea $1,032.00 y sus intereses, sino $1,800,
costas y honorarios de abogados.

Considerando la íntima relación que entre sí tienen los
dos errores señalados por los peticionarios y lo que hasta aquí
hemos resuelto en cuanto al primero, que estimamos como el
principal, y que la comisión de éste conlleva la anulación de la
sentencia recurrida, es innecesaria la determinación del se-
gundo señalamiento de error.

---

(¹⁶) Durante la vista celebrada ante el Tribunal Superior las partes
aceptaron como correcta la declaración de hechos probados del Tribunal de
Distrito.   En su párrafo 5 se consignó:

"5. Que en la contestación a la demanda en este caso y *al comenzar el
juicio, en corte abierta, los demandados Hull-Dobbs Co. of P. R. y Cecilio
Montalvo le ofrecieron al demandante entregarle la propiedad hipotecada
para que ejecutara su hipoteca y cobrara el importe de su pagaré. El
demandante rehusó aceptar esta oferta e insistió en que tenía derecho a
cobrar de los demandados solidariamente el valor de la propiedad hipotecada
al momento en que la adquirió Hull-Dobbs Co. of P. R."*   (Énfasis nuestro.)

La relación del caso que el Tribunal de Distrito preparó no fue objetada
por las partes.   De ella citamos lo que sigue:

"En el contrainterrogatorio, declaró [el demandante Amado Vega]
que al vencerse la hipoteca, fue a donde el alguacil a hacerle el requeri-
miento.   Primeramente había ido donde Vélez.   Que no recuerda el tiempo
que transcurrió de la visita a Vélez al requerimiento hecho al alguacil. *A la
fecha del requerimiento Vélez le había informado que el automóvil se lo había
vendido a la Hull-Dobbs.   Cuando fue donde el alguacil a hacerle el reque-
rimiento ya sabía que el carro lo tenía la Hull-Dobbs.   Que cuando Vélez le
informó que el carro lo había entregado a la Hull-Dobbs, fue a la Hull-
Dobbs y allí le negaron tener la propiedad, que entonces fue que hizo el re-
querimiento.*   Luego de que el alguacil le indicara que Vélez no tenía el carro,

*Por las razones expuestas, la sentencia recurrida, dictada por el Tribunal Superior, Sala de San Juan, el día 10 de julio de 1956, será anulada y el caso devuelto al tribunal a quo para que en su lugar dicte otra en consonancia con los términos de esta opinión.*

El Juez Asociado Sr. Serrano Geyls no intervino.

*Sometido:* 2 de mayo de 1955.* *Resuelto:* 14 de abril de 1959.

fue a donde su abogado. Que sabía que Vélez usó el carro por dos meses porque éste mismo se lo había informado. *Que hipotecó el vehículo y no se ocupó más de él. Estuvo viendo el carro por espacio de dos meses y después no lo volvió a ver. Después de los dos meses volvió a ver a Vélez y le preguntó por el automóvil y éste le dijo que lo había vendido a la Hull-Dobbs.* ... Que habló con el Lcdo. Ramón Luis Nevares en su oficina.

"*Luis G. Marín* declaró que trabaja en la Hull-Dobbs Co. desde mayo de 1952, es Gerente General de ventas ... Que conoce el vehículo De Soto objeto de este pleito ... Que actualmente [estimamos que se refería al 12 de mayo de 1955, fecha de su testimonio en corte] *dicho vehículo se encuentra en la Hull-Dobbs Co. en el solar de carros usados que tienen en la parada 23 de Santurce, Puerto Rico.* ... *Que la Hull-Dobbs está dispuesta en todo momento a entregar dicho vehículo. Que cuando se radicó la demanda y se formuló la contestación, la Hull-Dobbs estuvo dispuesta siempre a entregar el vehículo. Cuando Amado Vega Vega fue a la Hull-Dobbs a reclamar que le pagaran la hipoteca, ellos le ofrecieron el automóvil.* ...

"*Ramón L. Nevares* declaró que es abogado y notario y es el representante legal de la Hull-Dobbs Co. ... *Que el Sr. Amado Vega Vega, con anterioridad a la radicación de la demanda fue a verle a su oficina. El testigo le ofreció al Sr. Vega a nombre de su representada conseguirle y entregarle el carro. Que el Sr. Amado Vega quedó en contestarle, pero no recibió contestación.*" (Énfasis nuestro.)

