TEACHERS ANNUITY AND RETIREMENT SYSTEM, demandante y recurrente, *v.* LA SOCIEDAD DE GANANCIALES consti- tuida por CARLOS CANDELARIO y AURELIA R. DE CANDE- LARIO, y ÉSTOS por sí, demandados y recurridos.

*Número:* R-82-456    *Resuelto:* 25 de abril de 1984

· *Waldemar Del Valle Armstrong*, de *Parra, Del Valle & Frau*, abogado de la recurrente; *Samuel E. Polanco*, abogado de la recurrida.

El Juez Asociado Señor Torres Rigual emitió la opinión del Tribunal.

Consideramos en este recurso los requisitos y formas de la novación por sustitución de la persona del deudor y la figura aledaña de asunción de deudas, institutos que por sus efectos jurídicos y económicos son de importancia positiva en el tráfico moderno.

La novación por cambio de deudor ha sido pocas veces suscitada en nuestras decisiones. Tan sólo cuatro casos la discuten sin mayor exégesis. *Caribe Lumber Corp.* v. *Marrero*, 78 D.P.R. 868 (1955); *Cámara Insular* v. *Santiago Lavandero*, 83 D.P.R. 596 (1961); *Ríos Ovalle* v. *Rosaly*, 50 D.P.R. 682 (1936); y *Bou* v. *Colorado*, 24 D.P.R. 135 (1916). De la asunción de deuda encontramos ligera referencia en *Carmen Centrale* v. *Descartes, Tes.*, 75 D.P.R. 340 (1953), en relación con su valor para computar ganancias con fines contributivos; *Hull-Dobbs Co.* v. *Tribunal Superior*, 81 D.P.R. 221 (1959), que la menciona en el escolio 15, con citas de decisiones de la *Common Law* de Estados Unidos, y recientemente *Calo Rivera* v. *Reyes*, 115 D.P.R. 123 (1984), que discute los efectos de una cláusula de retención del precio por el comprador para pagar una hipoteca bajo la disposición del Art. 164 de la nueva Ley Hipotecaria. 30 L.P.R.A. sec. 2560.

Es conveniente exponer primero los hechos pertinentes en forma sucinta para luego discutir la doctrina a la luz de los planteamientos de las partes.

Los recurridos Carlos Candelario y su esposa otorgaron, en junio de 1972, un pagaré a favor de James T. Barnes por

la suma de $20,700 y lo garantizaron con una primera hipoteca constituida sobre el inmueble que adquirieron para vivienda en esa misma fecha. Años después, en octubre de 1978, los recurridos vendieron el inmueble al abogado Julio Aldea. La transacción se elevó a escritura pública el 28 de marzo de 1979, pactándose en el párrafo tercero de la misma que Aldea asumía el pago de la hipoteca que en ese momento ascendía a $19,042.91.

Con motivo de la falta de pago de varias mensualidades vencidas, James T. Barnes dedujo, en julio de 1979, demanda de ejecución de hipoteca por la vía ordinaria contra los esposos Candelario. Éstos comparecieron por propio derecho en una moción de prórroga para contestar en la que adujeron que habían vendido el inmueble al abogado Aldea, hecho que ya habían notificado dos días antes, el 18 de julio, mediante carta a James T. Barnes. El 14 de noviembre de 1979 Aldea realizó el pago de $1,725 para cubrir las mensualidades vencidas más la cantidad de $138 para las costas y gastos legales. James T. Barnes solicitó entonces el desistimiento sin perjuicio de pleitos por haber "llegado a un acuerdo satisfactorio mediante el cual se le ha permitido a la parte demandada que continúe haciendo pagos mensuales según originalmente convenido en el contrato de hipoteca". La parte demandada lo eran los esposos Candelario ya que nunca se les sustituyó por Aldea, no obstante que aquellos insistieran con el tribunal en la sustitución mediante una moción de oposición al desistimiento solicitado.

Posteriormente, el 10 de febrero de 1980, la recurrente Teachers Annuity and Retirement System, que había adquirido de James T. Barnes el pagaré hipotecario, instó demanda de cobro de dinero y ejecución de hipoteca por la vía ordinaria contra los Candelario. Éstos no contestaron y se les anotó la rebeldía. En la vista en rebeldía señalada para el 19 de mayo de 1981, compareció el abogado Aldea e informó al tribunal que él había comprado el inmueble y estaba en conversaciones con el representante legal de la

recurrente a los fines de ponerse al día en los pagos. El tribunal accedió a la suspensión. Así las cosas, comparecieron los esposos Candelario a impugnar la jurisdicción del tribunal por habérseles emplazado por edicto. Se dejó sin efecto la anotación de rebeldía por acuerdo de las partes y se le concedió un término de 10 días a los recurridos para que hicieran alegación responsiva. Aparece de los autos que los esposos Candelario solicitaron prórroga por estar las partes "en conversaciones para llegar a una solución adecuada". Finalmente al no contestarse la demanda el tribunal dictó sentencia en rebeldía que fue notificada el 9 de noviembre de 1981.

Conforme los trámites de ejecución el alguacil señaló la subasta para el 23 de febrero de 1982. En el entretanto los recurridos comparecieron al tribunal en solicitud de remedios al amparo de la Regla 49.2 de Procedimiento Civil. Adujeron, entre otras cosas, que se había efectuado una novación del contrato original de hipoteca por sustitución de la persona del deudor al aceptar James T. Barnes pagos del adquirente Aldea, que dicha defensa podría levantarse contra la recurrente Teachers Annuity porque ésta también había aceptado con sus actos al nuevo deudor. Se referían con ello a la comparecencia de Aldea a la vista del 19 de mayo a que hemos hecho referencia anteriormente.

El tribunal de instancia dejó sin efecto la sentencia en rebeldía al concluir que al aceptar la recurrente a Aldea como un nuevo deudor hipotecario se había operado una novación del contrato de hipoteca por lo que Aldea era una parte indispensable en el caso "por razón de haber sido los demandados de título liberados de la obligación por los propios actos y conducta de la demandante".

La recurrente Teachers Annuity nos pide la revocación de esta sentencia y señala como fundamento que el tribunal de instancia erró al determinar "que hubo una novación de la deuda por haberse sustituido el deudor y ordenar el archivo del caso, siendo el mismo un procedimiento *in rem* en la que los titulares registrales del inmueble gravado con

la hipoteca que se está ejecutando son partes indispensables".

I

En efecto, la novación por cambio de la persona del deudor sólo puede darse con el consentimiento del acreedor. Así lo preceptúa el Art. 1159 del Código Civil.

> La novación, que consiste en substituirse un nuevo deudor en lugar del primitivo, puede hacerse sin conocimiento de éste, pero no sin el consentimiento del acreedor. 31 L.P.R.A. sec. 3243.

J. M. Manresa advierte que este consentimiento tiene que constar en forma patente y manifiesta. *Comentarios al Código Civil Español*, 6ta ed., Madrid, Ed. Reus, 1967, T. 8, Vol. I, pág. 895. No puede ser objeto de suposiciones ni de presunciones puesto que su efecto jurídico es radical, extingue la deuda y desliga al deudor primitivo de toda obligación con el acreedor y crea un nuevo vínculo obligacional con el deudor sustituto. Más aún, la extinción de la deuda lleva consigo la extinción de las garantías y demás derechos accesorios, conforme las disposiciones del Art. 1161 del Código Civil, 31 L.P.R.A. sec. 3245.[1] En *Warner Lambert Co.* v. *Tribunal Superior*, 101 D.P.R. 378, 391–392 (1973), acotamos que una consecuencia tan drástica como ésta sólo podía producirse cuando las partes tenían una clara conciencia de ello.

En España, el Tribunal Supremo al interpretar el Art. 1205 del Código Civil español, equivalente a nuestro Art. 1159, ha resuelto reiteradamente que el consentimiento ha de constar de modo cierto y positivo y prestarse con el deliberado propósito de exonerar de sus obligaciones al deudor primitivo para hacerlos recaer en toda su extensión

---

[1] El Art. 1161 provee:

"Cuando la obligación principal se extinga por efecto de la novación, solo podrán subsistir las obligaciones accesorias en cuanto aprovechen a terceros que no hubiesen prestado su consentimiento."

sobre el nuevo deudor. Sentencias del 22 de junio de 1911, 9 de abril de 1930, 27 de mayo de 1931 y 9 de febrero de 1945, entre otras. Véase, además, la discusión del tema en Castán Tobeñas, *Derecho Civil español, común y foral*, 10ma ed., Madrid, Ed. Reus, 1967, T. 3, págs. 353-354; J. Puig Brutau, *Fundamentos de Derecho Civil*, 2da ed., Barcelona, Ed. Bosch, 1976, T. 1, Vol. 2, págs. 462-464; F. Puig Peña, *Tratado de Derecho Civil Español*, 2da ed., Madrid, Ed. Rev. Der. Privado, 1974, T. 3, Vol. II, págs. 401-402; M. Albaladejo, *Comentarios al Código Civil y compilaciones forales*, Madrid, Ed. Rev. Der. Privado, 1980, T. 16, Vol. I, pág. 576 *et seq.*; F. A. Sancho Rebullida, *La Novación de las Obligaciones*, Barcelona, Ed. Nauta, 1963, pág. 349.

▪ Es precisamente este deliberado propósito de exonerar al deudor primitivo lo que, a juicio de ese augusto tribunal, justifica que la insolvencia del nuevo deudor no haga revivir la acción del acreedor contra el primer deudor. Sentencia de 22 de junio de 1911. A este respecto, el Art. 1206 del Código Civil español preceptúa, al igual que nuestro Art. 1160, que:

> La insolvencia del nuevo deudor, que hubiese sido aceptado por el acreedor, no hará revivir la acción de éste contra el deudor primitivo, salvo que dicha insolvencia hubiese sido anterior y pública o conocida del deudor al delegar su deuda. 31 L.P.R.A. sec. 3244.

Dicho artículo no hace más que subrayar el carácter extintor de la novación por cambio de la persona del deudor.

▪ El caso de autos no satisface el rigor del consentimiento exigido para la novación. Los hechos que reseñamos anteriormente demuestran que ni James T. Barnes ni Teachers Annuity prestaron consentimiento al cambio de la persona del deudor pactado entre los Candelario y el comprador del inmueble Aldea en la cláusula tercera de la escritura. La recurrida, sin embargo, deriva el consentimiento, al igual que lo hace el tribunal de instancia, del mero hecho de haber James T. Barnes dirigido una carta a

Aldea el 28 de agosto de 1979 en que le recuerda su compromiso de traer la cuenta al día, (2) y haber aceptado pagos de éste por varias mensualidades vencidas. En cuanto a Teachers Annuity deriva el consentimiento del hecho de haber sostenido con Aldea conversaciones para el pago de la deuda.

No es éste el modo cierto y positivo del cual pueda derivarse un propósito deliberado de James T. Barnes o Teachers Annuity de aceptar a Aldea como su nuevo deudor. Por el contrario, James T. Barnes consideró siempre a los Candelario como sus deudores. Fue contra ellos que dedujo demanda de ejecución de hipoteca por la vía ordinaria y de la cual desistió, como ya apuntamos, "por haber llegado a un acuerdo satisfactorio con la parte demandada", o sea, los Candelario. A ellos se les requiere por escrito el pago de la deuda el 30 de abril y el 5 de mayo de 1979 sin que éstos se dignaran a contestar. No es hasta el 18 de julio —la demanda se presentó el 6 de julio y se emplazó el 13 de julio— que los Candelario le escriben a la acreedora que habían vendido el inmueble a Aldea. El próximo día 19 de julio, es que Aldea hace el compromiso para el pago de la deuda a James T. Barnes.

Por la misma vía, Teachers Annuity también instó demanda contra éstos en cobro de dinero y ejecución de hipoteca. Los esposos Candelario reconocieron su responsabilidad patrimonial cuando después que se dejó sin efecto la sentencia en rebeldía y se les dio oportunidad de contestar comparecieron al tribunal en solicitud de prórrogas fundada en que estaban en "conversaciones para llegar a una solución

---

(2) La carta lee:

"Sirve la presente a modo de recordatorio, de su compromiso de 19 de julio de 1979 de traer al día la cuenta del epígrafe dentro de 30 días.

"Al presente la deuda asciende a la suma de $2,466.49 sin incluir lo relativo a contribuciones, las cuales deben haber sido satisfechas antes de traer la cuenta al día.

"De no haber sido satisfechas dichas contribuciones las mismas deberán satisfacerse en nuestras oficinas al traerse la suma correspondiente a mensualidades y gastos."

adecuada". ¿Cuál era el propósito de conversar para un arreglo si ellos no eran ya deudores? Lo que procedía era contestar la demanda a esos efectos. Los recurridos no podían imponer por su cuenta un nuevo deudor a la recurrente y liberar así su patrimonio del débito.

Ausente, como hemos visto, el consentimiento de los recurrentes, el crédito podía hacerse efectivo en el patrimonio de los recurridos. Ciertamente, el único reclamo válido de los Candelario era contra Aldea, quien se había obligado con ellos a pagar la hipoteca. Este pacto siempre tiene eficacia interna entre ellos independientemente del consentimiento del acreedor. *Cf. Carmen Centrale* v. *Descartes Tes.*, supra, a las págs. 340, 352.

En virtud de las anteriores consideraciones concluimos que por no haber el acreedor recurrente consentido al cambio de deuda pactado entre los recurridos y el abogado Aldea, no se efectuó una novación del contrato y, por tanto, incidió el tribunal de instancia al resolver lo contrario.

Pasemos ahora a considerar lo relativo a la asunción de deuda.

## II

Con argumentos escorados en citas del maestro Roca Sastre, los recurridos sostienen que el derecho moderno ha superado el escollo de la novación subjetiva admitiendo la asunción de deuda; que Aldea asumió la deuda hipotecaria en escritura pública; que conforme las conclusiones del tribunal de instancia hubo una aceptación expresa del nuevo deudor Aldea y que en virtud de las disposiciones del Art. 164 de la Ley Hipotecaria sólo se requiere en los casos de cambio de deudor la aprobación tácita del acreedor.

Es cierto que la doctrina ha superado el rigor conceptualista que el Derecho romano impartió a la novación. Ayer la novación se concebía sólo como un medio de extinción de las obligaciones. Hoy, sin embargo, la admitimos con efectos más limitados, como es la simple modificación de la

obligación. *Warner Lambert*, supra, y autores allí citados; *Miranda Soto* v. *Mena Eró*, 109 D.P.R. 473 (1980). De la misma manera, la doctrina rechaza hoy la obligación como un vínculo personal y la considera como una relación patrimonial que admite el cambio del deudor sin afectar la existencia de la obligación. Se disipa así el concepto personalista de la obligación y se desplaza ésta hacia el patrimonio del deudor. F. C. De Diego y Gutiérrez, *Transmisión de las Obligaciones*, Madrid, Ed. Lib. Gen. Victoriano Suárez, 1912, págs. 65-82; Sancho Rebullida, *op. cit.*, págs. 15-93; Castán, *op. cit.*, pág. 262; García Amigo, *Transmisión de las relaciones obligatorias nacidas de un contrato*, 47 Rev. Der. Privado 25, 31-36 (1963); L. Diez-Picazo, *Fundamentos del Derecho Civil Patrimonial*, Madrid, Ed. Tecnos, 1979, págs. 783-784 y Albaladejo, *op. cit.*, págs. 498-504, 611-612.

Estos desarrollos ocurren lentamente en el Derecho. Generalmente, sus nociones y principios son reconocidos y discutidos por la glosa mucho antes de que el legislador los incorpore como preceptos positivos en una ley. Así se incorporan primeramente a la doctrina en la que superan las dificultades dogmáticas al confrontarse con el ordenamiento positivo. Éste es el caso de la asunción de deuda que como muchos otros institutos del Código Civil llega a la doctrina española por la vía germánica. P. Oertmann, *Transmisión de Obligaciones*, 10 Rev. Der. Privado 98, 99 (1923); L. Enneccerus, *Tratado de Derecho Civil* (B. Pérez González y J. Alguer, trads.), Barcelona, Ed. Bosch, 1954, T. II, Vol. I, pág. 416; R. Roca Sastre, *Derecho Hipotecario*, 7ma ed., Barcelona, Ed. Bosch, 1979, T. 1, Vol. I, pág. 415.

La doctrina clásica, afirman los textos, no admitía que las obligaciones pudieran transmitirse de una persona a otra porque se consideraban un vínculo de carácter personal. La única forma de transmitirlas era mediante la novación por sustitución del deudor, lo cual extinguía la obligación conjuntamente con sus garantías accesorias. Se entendía que la transmisión de la deuda producía una incompatibilidad

entre la obligación del deudor primitivo y la del nuevo deudor. De ahí, el efecto novatorio. F. Sánchez Román resume diáfanamente la concepción clásica al expresar: "El cambio de deudor supone siempre el cambio de deuda y constituye verdadera novación." *Estudios de Derecho Civil*, 2da ed., Madrid, Ed. Suc. Rivadeneyra, 1899, T. 4, pág. 427.

La fluidez del tráfico clamaba, sin embargo, por una mayor flexibilidad en el ordenamiento que permitiera la sustitución del deudor con la permanencia del vínculo obligacional. La preocupación fundamental se centraba en cómo preservar las garantías accesorias, personales y reales. El maestro C. De Diego, prolífero en sus innovaciones a la doctrina, abrió la brecha en el 1912 con su estudio sobre *La Transmisión de las Obligaciones, op. cit.*, que fue gradualmente aceptado por la doctrina y por el Tribunal Supremo de España. Sugirió él como solución una interesante teoría en que ataba la novación modificativa, acogida ya por la doctrina moderna, con la sucesión de la deuda a título particular. La transmisión de la deuda a un nuevo deudor opera aquí como una modificación de la obligación que no la extingue. Es decir, cambio del sujeto pasivo subsistiendo el *idem debitum.*

Esta nueva vertiente es aristada. Su tránsito al derecho positivo no fue fácil pues adolecía de algunas dificultades dogmáticas y prácticas. R. Roca Sastre y J. Puig Brutau, señalan, entre otras, que la teoría de la sucesión a título singular en las deudas pretende mantener la identidad del débito y, sin embargo, cambiar el patrimonio "que constituye su garantía normal". Además, preserva las garantías accesorias con un resultado injusto porque se obliga a los fiadores reales y personales del primer deudor a que sigan vinculados por razón del débito que recae sobre personas distintas de las que tuvieren en cuenta al prestar la garantía. *La Transmisión de las Obligaciones*, Est. Der. Privado, 1948, pág. 294.(3) Véanse también los comentarios de

---

(3) Citado por F.A. Sancho Rebullida, *La Novación de las Obligaciones*, Barcelona, Ed. Nauta, 1963, pág. 192.

Sancho Rebullida, *op. cit.*, pág. 192. El profesor De Castro también señala otras objeciones que considera insuperables y se pregunta: "¿Puede existir en nuestro derecho algún caso en que un nuevo deudor se sustituya en lugar del primitivo sin entrar dentro del supuesto de novación regulado en el artículo 1.205?" F. De Castro y Bravo, *Cesión de Arrendamientos y Subarriendos*, 156 Rev. Gen. Leg. Juris. 130, 143 y ss. (1939).

No empece las dificultades señaladas el nuevo sesgo doctrinal iniciado por el maestro C. De Diego se afinca en la doctrina moderna. El propio Sancho Rebullida, a pesar de su ponderada crítica, admite que la doctrina dominante reconoce ya la transmisibilidad de las deudas a título particular con el consentimiento del acreedor, *op. cit.*, pág. 204.

██ Ciertamente, si el Código Civil no prohíbe la asunción de deuda, como bien anota C. De Diego [4] y reafirman Pérez González y Alguer, [5] y la jurisprudencia reconoce que la novación no necesariamente es extintiva sino que puede ser modificativa —*Warner Lambert*, ante— nada se opone a que en armonía con la autonomía contractual propugnada por el Art. 1.207 del Código Civil, se admita en nuestro ordenamiento la asunción de deudas.

La jurisprudencia española no ha titubeado en admitir la asunción de deuda como un instituto derivado de la novación. Así, en la Sentencia de 22 de febrero de 1946 se expresó: "[A]un cuando nuestro Código no haga referencia expresa a la asunción de deuda, únicamente regulada en el Código Civil alemán, un importante sector doctrinal estima la posibilidad de aplicar sus normas fundamentales utilizando las disposiciones referentes a la novación de las obligaciones por cambio en la persona del deudor . . .". También la Sentencia de 5 de junio de 1961: "La asunción de deuda se viene consti-

---

[4] F. C. De Diego y Gutiérrez, *Transmisión de las Obligaciones*, Madrid, Ed. Lib. Gen. Victoriano Suárez, 1912, pág. 273.

[5] L. Enneccerus, *Tratado de Derecho Civil* (B. Pérez González y J. Alguer, trads.), Barcelona, Ed. Bosch, 1954, T. II, Vol. I, pág. 420.

tuyendo doctrinalmente dentro del campo de la novación y requiere siempre el conocimiento y consentimiento del acreedor."

La jurisprudencia de este Tribunal ha asumido sin exégesis la vigencia de la doctrina española. A este respecto, véanse los casos citados al comienzo de la opinión.

Veamos en lo aquí pertinente las cualidades que la distinguen de la novación.

## III

La asunción de deuda ha sido definida por la jurisprudencia como el contrato por el cual un tercero con asentimiento del acreedor toma a su cargo una obligación preexistente, se constituye en deudor, libera al deudor primitivo, y permanece invariable el resto de los elementos de la obligación. Sentencia del Tribunal Supremo de España del 10 de febrero de 1950.

La asunción de deuda requiere pues, al igual que la novación, el consentimiento del acreedor. Pero mientras en aquella el consentimiento tiene que ser manifiesto, de modo cierto y positivo, en ésta basta que sea tácito. Sancho Rebullida, *op. cit.*, pág. 416; Pérez González y Alguer, *op. cit.*, pág. 421.

El consentimiento tácito no es un concepto ajeno a nuestro ordenamiento. Se preceptúa en el articulado del Código Civil para diversos negocios jurídicos. Así, el Art. 953 provee para que la aceptación pura y simple de la herencia pueda ser expresa o tácita, al definirse ésta como "la que se hace por actos que suponen necesariamente la voluntad de aceptar, o que no habría derecho a ejecutar sino con la calidad de heredero"; [6] el Art. 1141 declara que la condonación puede ser expresa o tácita; [7] el Art. 1263 provee para que la con-

---

[6] 31 L.P.R.A. sec. 2781.

[7] 31 L.P.R.A. sec. 3201.

firmación pueda hacerse expresa o tácitamente, entendiéndose por tácita la que se hace "con conocimiento de la causa de nulidad y habiendo ésta cesado, el que tuviese derecho a invocarla ejecutase un acto que implique necesariamente la voluntad de renunciarla"; [8] el Art. 1601 admite para el mandato el consentimiento tácito, deducido éste de los actos del mandatario; [9] y el Art. 1456 determina cuándo existe tácita reconducción. [10]

Puede deducirse de lo anterior que el elemento determinante del consentimiento tácito es la conducta de la persona y no las palabras que utilice para expresarlo. Por eso, nos dice el profesor De Castro que se llama tácito al consentimiento que resulta "no de los dichos sino de los hechos". F. De Castro y Bravo, *El Negocio Jurídico*, Madrid, Ed. Ins. Nac. Est. Jur., 1967, sec. 84, pág. 67. Los hechos deben revelar inequívocamente la voluntad de consentir. No pueden ser compatibles con otra voluntad, ni estar sujetos a diversas interpretaciones. F. Puig Peña, *Compendio de Derecho Civil Español*, Barcelona, Ed. Nauta, 1966, T. 1, pág. 620; F. Soto Nieto, *La Estimación Jurídica del Silencio*, 11 Rev. Der. Esp. y Amer. 121 (1966).

Se recordará que los únicos hechos que aducen aquí los recurridos para sostener que hubo un consentimiento tácito para la sustitución del deudor consisten en haber James T. Barnes escrito la carta recordatoria a Aldea que reproducimos en el escolio 2, *ante*, y haber aceptado pagos de éste; y en cuanto a Teachers Annuity, por haber ésta sostenido comunicaciones con Aldea por el pago de la deuda. ¿Puede derivarse de estos hechos inequívocamente un consentimiento

---

[8] 31 L.P.R.A. sec. 3522.

[9] 31 L.P.R.A. sec. 4422.

[10] El Art. 1456 lee:.
"Si al terminar el contrato permanece el arrendatario disfrutando quince días de la cosa arrendada con aquiescencia del arrendador, se entiende que hay tácita reconducción por el tiempo que establecen las secs. 4083 y 4092 de este título, a menos que haya precedido requerimiento." 31 L.P.R.A. sec. 4063.

tácito? La contestación es en la negativa puesto que, como ya vimos, James T. Barnes siempre consideró a los Candelario como sus deudores. La carta recordatoria dirigida a Aldea es compatible con la intención de requerir el pago a la persona que expresamente asumió esa obligación en la escritura de compraventa, y por tanto, su compromiso de pagar a James T. Barnes dimana de la obligación escrituraria. Aldea venía obligado con los esposos Candelario a pagar la deuda con o sin requerimiento de James T. Barnes. El hecho de que ésta le recordara el compromiso y aceptara pagos de él no conlleva inequívocamente la intención de consentir, pues es compatible con otra intención.

Además, el Art. 1112 del Código Civil provee específicamente para el cumplimiento de la obligación por un tercero:

> Puede hacer el pago cualquier persona, tenga o no interés en el cumplimiento de la obligación, ya lo conozca y lo apruebe, o ya lo ignore el deudor. 31 L.P.R.A. sec. 3162.

El pago hecho, pues, por un tercero tiene plena eficacia. Más aún, el acreedor no puede impedirlo, Manresa, *op. cit.*, pág. 601. Siendo ello así, la aceptación del pago verificado por Aldea puede ser interpretada con otra voluntad que no necesariamente es la de consentir, sino meramente aceptar el pago de un tercero.

El consentimiento tácito es siempre una cuestión de intención, y como tal, requiere la consideración de todas las circunstancias del caso. Es por eso que advertimos que la aceptación de pagos sin más, en las circunstancias de este caso, no constituye un consentimiento tácito. Por supuesto, una aceptación de pagos en circunstancias que revelen un patrón de conducta del cual pueda derivarse la intención de aceptar al nuevo deudor constituye, sin duda, consentimiento tácito.

## IV

La nueva Ley Hipotecaria no es de aplicación al caso de autos, puesto que los hechos aquí ocurrieron antes del 8 de agosto de 1980, fecha de su vigencia. Pero, aun si lo fuera, el resultado a que hemos llegado sería el mismo porque dicha ley en nada ayuda la posición de los recurridos. El Art. 164 de dicha ley, en que ellos pretenden apoyar sus argumentos, requiere también el consentimiento tácito del acreedor:

En caso de venta de la finca hipotecada, si el vendedor y el comprador hubieren pactado que el segundo se subrogará no sólo en las responsabilidades derivadas de la hipoteca, sino también en la obligación personal con ella garantizada, quedará el primero desligado de dicha obligación, si el acreedor *prestare su consentimiento* expreso o tácito. (Énfasis suplido.) 30 L.P.R.A. sec. 2560.

Dicho artículo no hace más que recoger la doctrina de asunción de deuda que hemos expuesto en esta opinión. Roca Sastre, *op. cit.*, pág. 413. Por las razones expuestas, el argumento es inadmisible.

En virtud de los anteriores fundamentos *se dictará sentencia que expida el auto y revoque la sentencia recurrida.*

El Juez Asociado Señor Díaz Cruz emitió opinión disidente en parte y concurrente en parte. El Juez Asociado Señor Rebollo López disiente y se reserva el derecho de emitir opinión disidente al respecto.

—O—

Opinión disidente en parte, y concurrente en el resultado del Juez Asociado Señor Díaz Cruz.

Considero inadecuados los fundamentos de decisión.

El 8 junio, 1972 Carlos Candelario y su esposa Aurelia emitieron un pagaré a favor de James T. Barnes of Puerto Rico, Inc. o a su orden, por $20,700 distribuidos en plazos mensuales de $137.86 desde el 1ro agosto, 1972 hasta el 1ro

julio, 2002, con interés al 7% anual, y el mismo día consti-
tuyeron hipoteca en garantía de dicha obligación sobre casa
de dos plantas en hormigón en solar de 182.42 m/c que es el
Núm. 40, bloque NL, urbanización "Buenaventura" del ba-
rrio Guanajibo de Mayagüez, que se inscribió en el Registro
de la Propiedad. En octubre de 1978 los deudores hipote-
cantes vendieron la casa al abogado Sr. Julio Aldea Irizarry,
compraventa que formalizaron en escritura Núm. 2 de 28
marzo, 1979 ante el notario Lic. Segismundo López, por pre-
cio de $26,642.91 que satisfizo el comprador con pagaré per-
sonal de $7,600 y asunción de un balance de $19,042.91 en la
hipoteca de James T. Barnes. El título de este deudor subro-
gado no se presentó al Registro, pero el 18 de julio siguiente
el vendedor Candelario notificó la venta a su acreedora
Barnes, con copia de la escritura y cierra su carta así:

> Con fecha del 13 de julio fuí emplazado por ustedes para
> responder por una demanda de ejecución de hipoteca de la
> referida propiedad.
> Solicito se me excluya de su lista de deudores y desistan de
> la demanda en lo que a mí y mi esposa se refiere.

El 28 agosto, 1979 el abogado de la acreedora Barnes le
escribe al deudor subrogado Aldea en los siguientes térmi-
nos:

Lic. Julio Aldea Irizarry
Calle San Vicente #60
Mayagüez, Puerto Rico 00708

Re: Cuenta 4437
James T. Barnes & Co.
file #7392

Estimado compañero:

> Sirve la presente a modo de recordatorio, de su compromiso
> de 19 de julio de 1979 de traer al día la cuenta del epígrafe
> dentro de 30 días.
> Al presente la deuda asciende a la suma de $2,466.49 sin
> incluir lo relativo a contribuciones, las cuales deben haber sido
> satisfechas antes de traer la cuenta al día.
> De no haber sido satisfechas dichas contribuciones las mis-

mas deberán satisfacerse en nuestras oficinas al traerse la suma correspondiente a mensualidades y gastos.

Cordialmente,

(firmado) Pedro D. Quiles Mariani.

En atención a este requerimiento, el nuevo dueño de la casa, licenciado Aldea, pagó a Barnes la cantidad de $2,593.46 en cheque certificado del Banco Popular, y en consecuencia el 15 noviembre, 1979 James T. Barnes desistió de la acción sobre ejecución de hipoteca que había incoado contra el deudor original Candelario bajo el número Civil CS-79-3620 de la Sala de Mayagüez. El 26 del mismo noviembre, la sala dictó sentencia de desistimiento, sin costas.

Desde mucho antes de entrar en vigor nuestra Ley Hipotecaria de 1979 se había asentado —entre jurisprudencia y comentaristas de España— el principio de sustitución del deudor por delegación del original. "La sentencia de 16 junio 1908 dice a este propósito que 'el precepto del Art. 1.205 del Código no significa ni requiere que el consentimiento del acreedor en el cambio del deudor se haya de prestar precisamente en el acto mismo en que los deudores acuerden la sustitución, porque siendo su notorio objeto el mantenimiento íntegro del derecho del acreedor, basta con que éste manifieste dicho consentimiento *en cualquiera forma y momento*, mientras el acuerdo de los deudores permanezca subsistente'." J. M. Manresa, *Comentarios al Código Civil Español*, 6ta ed., Madrid, Ed. Reus, 1967, T. 8, Vol. 1, pág. 889.

El principio adquirió cuerpo estatutario en el Art. 164 de la Ley Hipotecaria y del Registro de la Propiedad que con fuente en el Art. 118 de la de España, ordena:

En caso de venta de la finca hipotecada, si el vendedor y el comprador hubieren pactado que el segundo se subrogará no sólo en las responsabilidades derivadas de la hipoteca, sino también en la obligación personal con ella garantizada, quedará el primero desligado de dicha obligación, si el acreedor prestare su *consentimiento expreso o tácito*.

Explica Roca Sastre: (¹)

El art. 118 de la Ley Hipotecaria [164 P.R.] facilita grande-
mente el cumplimiento del requisito del *asenso o consenti-
miento del acreedor* hipotecario —que es esencial para que la
asunción del débito sea pefecta— al reducir su alcance a los
*efectos liberatorios* del anterior deudor, al permitir que sea
*tácitamente manifestado,* al no exigir que sea prestado *en el
propio acto de la compraventa,* y al prescindir del trámite de
la *notificación de la asunción al acreedor.* Asimismo, da base
para que el efecto liberatorio que provoca el consentimiento
del acreedor *se retrotraiga* al tiempo de pactarse la asunción
entre vendedor y comprador.

La reseña cronológica de la conducta de James T. Barnes
frente a la oferta de un nuevo deudor por Candelario, mues-
tra más que un *tácito* consentimiento, la patente y mani-
fiesta aprobación de la sustitución que tiene efecto liberato-
rio del primitivo deudor. La opinión circulada niega esa
atribución a Barnes con el argumento de que no podía
rechazar el pago del comprador Aldea porque el Art. 1112
dice que puede hacer el pago cualquier persona, tenga o no
interés en el cumplimiento de la obligación, ya lo conozca y lo
apruebe, o ya lo ignore el deudor. La inaplicación de dicho
precepto que regula el *pago por cuenta de otro,* es palmaria.
Baste recordar que el deudor subrogado Aldea no pagó por
iniciativa propia, sino requerido por la acreedora ya notifi-
cada de su asunción de la obligación, y que no pagó por
cuenta de otro ni para beneficio de Candelario, sino en des-
cargo de la obligación que libremente contrajo y que ahora
Barnes le exigía.

Eventualmente, James T. Barnes vendió y endosó el
pagaré hipotecario a la recurrente Teachers Annuity and
Retirement System que en febrero de 1981 instó demanda
contra el deudor primitivo Candelario y su esposa (Civil CS-
81-113) en ejecución de hipoteca en que le reclama un ba-

---

(¹)*Derecho Hipotecario,* 7ma ed., Barcelona, Ed. Bosch, 1979, T. 4, Vol. 1, pág.
419.

lance de $18,739.61 y créditos accesorios, que la Sala de Mayagüez desestimó (a moción Regla 49.2) luego de un recuento de las actuaciones de Barnes aprobatorias de la sustitución del deudor, y concluyó que Candelario había sido liberado de la obligación y que la parte propia contra la cual debía la actora dirigir la acción ejecutiva es el comprador licenciado Aldea Irizarry. Erró porque la sustitución de deudor consentida por Barnes no es imputable a la adquirente y tenedora de la obligación Teachers Annuity. No hubo prueba[2] de que ésta aceptara al nuevo deudor Aldea, cuyo título permanecía sin registrar y como ejecutante debía ceñirse a las constancias del Registro. *Housing Investment Corp.* v. *Registrador*, 110 D.P.R. 490, 494, 496 (1980).

La liberación del deudor original acordada por Barnes no obliga a la recurrente Teachers por su condición dual de tenedor de buena fe y tercero hipotecario. Teachers es tenedor de buena fe, Art. 405 C.Com., 19 L.P.R.A. sec. 92, que posee el documento, según el Art. 410 (19 L.P.R.A. sec. 97)

---

[2] Carece de elementos de consentimiento tácito por Teachers la única ofrecida, que es la minuta de 29 mayo, 1981 que dice:

"Llamado este caso para la vista en rebeldía no comparece el Lcdo. Waldemar del Valle, abogado de la parte demandante.

"El Lcdo. Julio Aldea informa al Tribunal que esta propiedad fue comprada por él y aparece a nombre de los demandados en este caso porque no se ha hecho todavía la presentación en el Registro de la Propiedad.

"El Lcdo. Aldea expresa que ha conversado con el Lic. Del Valle y él ha estado de acuerdo que se suspenda la vista en el día de hoy, a los fines de que para fin de mes se ponga al día en los pagos.

"El Tribunal accede a la suspensión y el Lic. Del Valle deberá radicar el sello de arancel correspondiente.

"El caso se señalará nuevamente cuando así lo solicite la parte demandante.

"*NOTIFICACION*

Lcdo. Waldemar del Valle
Apartado 1287
Ponce, Puerto Rico 00731

"En Mayagüez, Puerto Rico a 29 de mayo de 1981

(Firmado) Daisy Ruiz
"Por: Sec. Aux. Transcriptor II"

Nótese la ausencia de la representación legal de la demandante Teachers, que priva el acto de concurrencia de Teachers en lo informado.

"libre de defectos en el título de propiedad de las partes que le hayan precedido, y sin responsabilidad en cuanto a las alegaciones que, en su defensa, pudieran utilizar esas mismas partes entre sí, y podrá exigir el pago del importe total del documento a todas las partes responsables de dicho pago".

Distinto a Barnes, no revela su conducta ánimo de aceptar la subrogación del deudor en el crédito hipotecario que adquirió sin que del Registro apareciera modificación alguna del mismo; y es, por tanto, tercero protegido por los Arts. 144 de la Ley Hipotecaria de 1893 y 181 de su Reglamento; (3) y el Art. 187 de la nueva ley de 1979 que incorpora literalmente los dos anteriores citados.

La falta de inscripción de la venta a Aldea, y la ausencia total en el Registro de toda referencia a la sustitución de deudor, resulta en inexactitud del Registro en la que su contenido no concuerda con la realidad jurídica extraregistral. La endosataria Teachers, que depende de la fe pública para la integridad de su título, tipifica el tercero protegido. "Por esto" dice Roca Sastre, "el concepto de tercero hipotecario requiere la *inexactitud del Registro* como presupuesto esencial."

Por consiguiente, sólo puede hablarse propiamente de tercero *hipotecario* cuando, al tiempo de adquirir este tercero

---

(3) Art. 144 Ley.—*No inscripción de modificaciones a la obligación.*

"Todo hecho o convenio entre las partes que pueda modificar o destruir la eficacia de una obligación hipotecaria anterior, como el pago, la compensación, la espera, el pacto o promesa de no pedir, la novación del contrato primitivo y la transacción o compromiso, no surtirá efecto contra tercero como no se haga constar en el registro por medio de una inscripción nueva, de una cancelación total o parcial o de una nota marginal, según los casos."

Art. 181 Reglamento.—*Inscripción de modificación de obligación hipotecaria.*

"Conforme a lo dispuesto en la sec. 257 de este título, cuando el hecho o convenio entre las partes produzca novación total o parcial del contrato inscrito, se extenderá una nueva inscripción y se cancelará la precedente. Cuando dé lugar a la resolución e ineficacia del mismo contrato, en todo o en parte, se extenderá una cancelación total o parcial; y cuando tenga por objeto, bien llevar a efecto un contrato inscrito pendiente de condiciones suspensivas, o bien hacer constar el pago de parte de una deuda hipotecaria, se extenderá una nota marginal."

el derecho inscrito, sea *inexacto el contenido registral* de la hoja o registro particular de la finca correspondiente, ya afecte a la existencia, subsistencia o titularidad del derecho real inscrito objeto de la adquisición, o a su configuración, naturaleza o extensión, o a sus cargas, condiciones, limitaciones, etc., debido todo a cualquiera de las causas que pueden originar dicha inexactitud. (Énfasis en el original.) R. Roca Sastre, *Derecho Hipotecario*, 7ma ed., Barcelona, Ed. Bosch, 1979, T. I, pág. 620.

En el curso de negociación del pagaré, el impedimento creado por Barnes al liberar de responsabilidad al deudor original Candelario, no se transfiere a Teachers, adquirente y tenedor de buena fe, y tercero civil tanto como registral.

Procede la revocación.