# 2008 DTA 73

**TRIBUNAL DE APELACIONES**
**REGIÓN JUDICIAL DE PONCE**
**PANEL X**

BANCO BILBAO VIZCAYA ARGENTARIA PUERTO RICO
Apelante

v.

ZAIDA IMAR ROMÁN GONZÁLEZ; ZAIDA GONZÁLEZ TORRES
Apeladas

Núm. KLAN-07-00090

San Juan, Puerto Rico, a 13 de mayo de 2008

Panel integrado por su Presidente, el Juez González Vargas,
y las Juezas Feliciano Acevedo y Carlos Cabrera

Feliciano Acevedo, Juez Ponente

\*

## TEXTO COMPLETO DE LA SENTENCIA

Mediante recurso de apelación, comparece el Banco Bilbao Vizcaya Argentaria (BBVA, parte apelante). Nos solicita que revoquemos la Sentencia del Tribunal de Primera Instancia, Sala de Ponce (TPI), emitida el 28 de noviembre de 2006 y notificada el 22 de diciembre del mismo año. La Sentencia apelada ordenó la ejecución de la hipoteca que garantizaba un pagaré de $112,000.00 y que grababa un inmueble perteneciente a la Sra. Zaida I. Román González y la Sra. Zaida González Torres (parte apelada).

Por los fundamentos que a continuación exponemos, resolvemos confirmar la Sentencia apelada.

### I

De acuerdo al expediente ante nuestra consideración, el Sr. Román Almodóvar otorgó varías líneas de crédito con el BBVA. El 13 de mayo de 2003, garantizó las mismas, mediante contrato de prenda en el cual entregó un pagaré por la suma de $112,000.00, con garantía hipotecaria sobre un inmueble ubicado en el Municipio de Juana Díaz. [1] En lo pertinente, según consta en el contrato de prenda, el Sr. Román Almodóvar (prestatario) se obligó de la siguiente forma:

*"SEGUNDO: PRENDA: El PRESTATARIO por la presente grava, cede, entrega y **da en prenda el Pagaré Hipotecario, incluyendo su frutos y cualesquiera productos, al BANCO, quien es tenedor prendario del Pagaré, para garantizarle el fiel pago y cumplimiento de todas y cada una de sus obligaciones, presentes y futuras, directas e indirectas, absolutas y contingentes, sean o no líquidas, vencidas y exigibles, que adeude al BANCO,** surjan éstas transacciones respecto a las cuales el BANCO advenga a ser su acreedor, incurridas por el PRESTATARIO y el BANCO, o de otras transacciones respecto a las cuales el BANCO advenga a ser su acreedor, incurridas por el PRESTATARIO por sí sólo o con otras personas como deudor o como garantizador, así como cualesquiera obligaciones subsidiarias relacionadas con las mismas, incluyendo comisiones, intereses, cargos, penalidades, gastos, costas y honorarios de abogado, sean bajo el Préstamo a Plazos, cualesquiera pagaré que pueda evidenciarlo, este Contrato o cualquier otro contrato, instrumento o documento, en adelante denominadas las "Obligaciones Garantizadas".* [2] (Énfasis suplido.)

El 30 de enero de 2004, el Sr. Román Almodóvar vendió la propiedad gravada con el pagaré antes mencionado a la parte apelada, mediante la Escritura de Compraventa y Asunción de Hipoteca Núm. 11 ante el Notario Félix L. Negrón Martínez. En lo pertinente, la parte apelada se obligó a lo siguiente: *"La parte compradora hará las gestiones con el acreedor hipotecario para pagar la cuenta que está a nombre de los vendedores hasta su saldo total, y una vez recibido el pagaré hipotecario de las referidas hipotecas procederá a cancelar dicho pagaré".* [3] A su vez, en la escritura se expresó que el balance pendiente del pagaré hipotecario era de $93,456.60.

El 26 de mayo de 2004, el Sr. Román Almodóvar presentó Petición de Quiebra (Caso Núm. 04-5589), al amparo del Capítulo 7 de la Ley de Quiebra, 11 U.S.C.A. §701 et. seq. El caso de quiebras culminó con el descargo de todas las deudas no aseguradas del Sr. Román Almodóvar, el 25 de mayo de 2006.

El 26 de abril de 2005, la parte apelante presentó ante el TPI la demanda en cobro de dinero y ejecución de hipoteca por la vía ordinaria que originó el pleito de marras. En síntesis, la parte apelante reclamó a la parte apelada el pago no sólo del balance del pagaré con garantía hipotecaria, sino de todos los créditos otorgados al Sr. Jorge Román Almodóvar por dicha institución bancaria.

Continuados los trámites de rigor, el 3 de noviembre de 2005, la parte apelante presentó una *"Moción Solicitando Se Dicte Sentencia Sumaria"* y alegó que al adquirir el inmueble hipotecado ofrecido como garantía mediante contrato de prenda, la parte apelada se había obligado a satisfacer todas las deudas contraídas por el Sr. Román Almodóvar con el BBVA.

El 8 de diciembre de 2005, la parte apelada presentó una *"Moción Allanándonos Parcialmente a Sentencia Sumaria y Replicando Parcialmente la Misma"*. En síntesis, la parte apelada se allanó a que el TPI dictase sentencia sumaria, pero alegó que su responsabilidad se limitaba a la responsabilidad hipotecaria y que no respondía con sus bienes personales por las deudas del Sr. Román Almodóvar, más allá del bien hipotecado. Por ende, solicitó que se ejecutara el bien hipotecado, y se opuso a la imputación de responsabilidad solidaria para tener que responder por obligaciones que no asumió.

El TPI ordenó la celebración de una vista el 6 de marzo de 2006, para discutir la solicitud de sentencia sumaria. Celebrada la vista, el TPI dispuso que las partes presentaran memorandos de derecho en apoyo a sus respectivas alegaciones. Finalmente, el TPI emitió la Sentencia apelada y declaró *"Con Lugar"* la solicitud de sentencia sumaria y ordenó la ejecución de la hipoteca del inmueble de la parte apelada. Sin embargo, el TPI resolvió que la parte apelada no respondía en su carácter personal por el balance de las deudas incurridas por el Sr. Román Almodóvar.

Oportunamente, la parte apelante presentó una *"Moción de Reconsideración"* que no fue considerada por el TPI, por lo cual se considera denegada de plano. Inconforme con el resultado, acude ante nos la parte apelante y

aduce que el TPI cometió dos errores, a saber:

*"Primer Error*

*ERRÓ EL TRIBUNAL AL CONCLUIR EN SU SENTENCIA QUE LAS APELADAS ZAIDA IMAR ROMÁN GONZÁLEZ Y ZAIDA GONZÁLEZ TORRES AL ADQUIRIR DEL SR. JORGE ROMÁN ALMODOVAR LA PROPIEDAD INMUEBLE Y ASUMIR LAS DEUDAS QUE ÉSTA GARANTIZABA, NO SE OBLIGARON EN SU CARÁCTER PERSONAL AL PAGO DE DEUDAS RECLAMADAS*

*Segundo Error*

*ERRÓ EL TRIBUNAL AL NO DISPONER EN SU SENTENCIA PARA EL PAGO DE LAS COSTAS, GASTOS Y HONORARIOS DE ABOGADO QUE APARECEN GARANTIZADOS CON LA HIPOTECA QUE SE EJECUTÓ Y QUE FUERON RECLAMADAS EN LA DEMANDA DEL CASO"*

Contando con el beneficio de la comparecencia de la parte apelada, procedemos a exponer el derecho aplicable.

## II

### A

Como se sabe, las obligaciones nacen de la ley, de los contratos y cuasicontratos, y de los actos y omisiones ilícitos en que intervenga cualquier género de culpa o negligencia. Aquellas obligaciones que nacen de un contrato tienen fuerza de ley entre las partes contratantes, y deben cumplirse a tenor del mismo. Arts. 1042 y 1044 del Código Civil de Puerto Rico, 31 L.P.R.A. §§2992 y 2994.

En Puerto Rico se reconoce el principio de autonomía contractual entre las partes contratantes, lo cual significa que éstas pueden establecer los pactos, cláusulas y condiciones que tengan por convenientes, siempre que no sean contrarias a las leyes, la moral y el orden público. Art. 1207 del Código Civil, 31 L.P.R.A. §3372. El referido principio está atado a la norma jurídica de que el mero consentimiento obliga, pues perfeccionado un contrato mediando el consentimiento de las partes, éstas se obligan desde ese momento, no sólo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que, según su naturaleza, sean conformes a la buena fe, al uso y a la ley. Art. 1210 del Código Civil, 31 L.P.R.A. §3375.

Por otro lado, el Art. 1157 del Código Civil, 31 L.P.R.A. §3241, establece que existen tres formas de modificar las obligaciones: variando su objeto o sus condiciones principales, sustituyendo la persona del deudor, o subrogando a un tercero en los derechos del acreedor.

Cuando en una obligación se sustituye la persona del deudor, ocurre la novación del contrato. Art. 1159 del Código Civil, 31 L.P.R.A. §3243. Sin embargo, no toda modificación de éste produce efectos extintivos, pues la extinción de la obligación original sólo se produce cuando así se declara terminantemente en el nuevo contrato, o cuando la antigua y la nueva obligación son de todo punto incompatibles. Art. 1158 del Código Civil, 31 L.P. R.A. §3242.

La incompatibilidad que produce la novación supone un cambio tan radical en la naturaleza de la nueva obligación -en relación con la antigua- que ambas no pueden coexistir por ser mutuamente excluyentes. Esto es, la alteración introducida al contrato por la nueva obligación debe ser de tal naturaleza que impida el cumplimiento de la obligación antigua. G. & J., *Inc. v. Doré Rice Mill, Inc.*, 108 D.P.R. 89 (1978).

Por su parte, el Art. 1159 del Código Civil de Puerto Rico, 31 L.P.R.A. §3243, dispone que la novación que consiste en sustituirse un nuevo deudor en lugar del primitivo, puede hacerse sin consentimiento de éste, pero no sin consentimiento del acreedor. Además, en *Teachers Annuity v. Soc. de Gananciales*, 115 D.P.R. 277 (1984), el Tribunal Supremo resolvió que el propósito deliberado de aceptar al nuevo deudor debe hacerse de manera cierta y positiva.

De otra parte, la modificación de una de las condiciones principales del contrato no necesariamente supone una novación extintiva, si no es esa la voluntad expresa de las partes. Del mismo modo, la novación extintiva puede operar aun con la simple modificación de una condición secundaria, si eso es lo que las partes quieren y así lo declaran terminantemente. *Warner Lambert Co. v. Tribunal Superior*, 101 D.P.R. 378 (1973).

La novación extintiva no puede ser objeto de suposiciones ni de presunciones, puesto que su efecto jurídico es radical, extingue la deuda y desliga al deudor primitivo de toda obligación con el acreedor y crea un nuevo vínculo obligacional con el deudor sustituto. Más aún, la extinción de la deuda lleva consigo la extinción de las garantías y demás derechos accesorios, conforme las disposiciones del Art. 1161 del Código Civil, 31 L.P.R.A. §3245. Una consecuencia tan drástica como ésta sólo podía producirse cuando las partes tenían una clara conciencia de ello. *Teachers Annuity v. Soc. de Gananciales, ante.*

En cuanto a la asunción de deuda, ésta ha sido definida por la jurisprudencia como el contrato por el cual un tercero, con consentimiento del acreedor, toma a su cargo una obligación preexistente, se constituye en deudor, libera al deudor primitivo, y permanece invariable el resto de los elementos de la obligación. La asunción de deuda requiere pues, al igual que la novación, el consentimiento del acreedor. No obstante, mientras en la novación el consentimiento tiene que ser manifiesto, de modo cierto y positivo, en la asunción de deuda, basta que sea tácito. *Teachers Annuity v. Soc. de Gananciales, ante.*

En *Teachers Annuity v. Soc. de Gananciales, ante*, el Tribunal Supremo resolvió que el hecho de que el acreedor acepte el pago de la obligación por parte de una tercera persona, no implica que haya consentido tácitamente a que dicha tercera persona asuma la deuda. El consentimiento del acreedor a dicha sustitución del deudor -añadió el Tribunal Supremo-, puede ser tácito, y su elemento determinante es la conducta del acreedor. Los hechos *"deben revelar **inequívocamente** la voluntad de consentir [y] no pueden ser compatibles con otra voluntad, ni estar sujetos a diversas interpretaciones"*. *Íd.*, a la pág. 290 (Citas omitidas) (Énfasis nuestro). El Tribunal añadió que en virtud de lo dispuesto en el Artículo 1112 del Código Civil, 31 L.P.R.A. §3162, el acreedor no puede rechazar el pago de una deuda efectuado por un tercero, y su aceptación no constituye el consentimiento tácito requerido para la asunción de deuda que liberaría al deudor original. Dicho consentimiento -dictaminó el Tribunal Supremo-, *"es siempre una cuestión de intención y, como tal, requiere la consideración de todas las circunstancias del caso."* *Íd.*, a la pág. 241. Finalmente, el Tribunal Supremo concluyó que:

*"[e]l hecho de que ésta [la acreedora hipotecaria] le recordara el compromiso y aceptara pagos de él [el aspirante a nuevo deudor] no conlleva inequívocamente la intención de consentir, pues [ello] es compatible con otra intención"..., y "puede ser interpretada con otra voluntad que no necesariamente es la de consentir, sino meramente aceptar el pago de un tercero."* *Íd.*, a la pág. 291. (Énfasis nuestro).

Por último, la Ley Hipotecaria de Puerto Rico, en su Artículo 164, 30 L.P.R.A. § 2560, dispone:

*"En caso de venta de la finca hipotecada, si el vendedor y el comprador hubieren pactado que el segundo se subrogará no sólo en las responsabilidades derivadas de la hipoteca, sino también en la obligación personal con ella garantizada, quedará el primero desligado de dicha obligación, si el acreedor prestare su consentimiento expreso o tácito.*

*Si no se hubiere pactado la trasmisión de la obligación, pero el comprador hubiese descontado su importe del precio de la venta, o lo hubiere retenido, aunque no se exprese en la escritura, y al vencimiento de la obligación fuera ésta satisfecha por el deudor que vendió la finca, quedará subrogado éste en el lugar y grado del acreedor hasta tanto el comprador le reintegre el total adeudado.* " (Énfasis nuestro.)

## B

Sabido es que las partes contratantes se pueden obligar al cumplimiento de una cláusula penal conforme permite el Artículo 1106 del Código Civil, 31 L.P.R.A. §3131, a saber: *"[e]n las obligaciones con cláusula penal, la pena sustituirá a la indemnización de daños y al abono de intereses en caso de falta de cumplimiento, si otra cosa no se hubiere pactado."* Esta figura jurídica proviene del derecho romano y consiste en garantía del derecho de crédito, D.E. Espín, La cláusula penal en las obligaciones contractuales, 30 Rev. Der. Priv. 145, 146 (1946). La doctrina la ha definido como una *"estipulación de carácter accesorio, establecida en un contrato, con la finalidad de asegurar el cumplimiento de la obligación principal, en virtud de la que el deudor de la prestación que se trata de garantizar viene obligado a pagar, por lo general, determinada cantidad de dinero"*, *Levitt & Sons of P.R., Inc. v. D.A.C.O.,* 105 D.P.R. 184, 193 (1976).

En principio, mediante la cláusula penal se restituye o compensa al acreedor por los daños ocasionados por el incumplimiento, además de los intereses. Los propósitos fundamentales de una cláusula penal en un contrato son los siguientes: (1) la de asegurar el cumplimiento de una obligación principal; y (2) la de evaluar por anticipado los perjuicios que habría de ocasionar al acreedor en incumplimiento inadecuado de la obligación. También, la cláusula penal *"[t]iene una función punitiva de violación del deber jurídico que da a la cláusula su otro nombre de 'pena convencional' y que, rebasando el motivo de lucro en la obligación ordinaria, introduce un elemento de coerción y amenaza que apremia al deudor al cumplimiento."* (Subrayado nuestro). *Jack's Beach Resort, Inc. v. Cía. Turismo,* 112 D.P.R. 344, 349 (1982).

Ahora bien, el Artículo 1108, ante, §3133, permite la modificación de la pena al disponer así: *"[e]l tribunal o juez modificará equitativamente la pena cuando la obligación principal hubiera sido en parte o irregularmente cumplida por el deudor."* Además, las cláusulas penales deben interpretarse restrictivamente. En *WRC Props., Inc. v. Santana,* 116 D.P.R. 127 (1986), se afirma categóricamente:

*"En cuanto a una cláusula penal,* **nuestra interpretación jurisprudencial la mira con criterio restrictivo** *según enunciado por la doctrina española como corolario del principio favor debitoris. Albaladejo, [Comentarios al Código civil y compilaciones forales, Madrid, Ed. Rev. Der. Privado, 1983, T. XV, Vol. 2], págs. 462-465. No podemos olvidar que la equidad dimanante del Art. 1108 del Código Civil, [cita omitida], faculta a un tribunal en su amplitud de remedios, inclusive a limitar el derecho inherente de una parte a resolver una obligación con cláusula penal.* **A su vez permite moderar la pena cuando la desproporción entre la infracción del contrato y la pena convencional es evidente"***. Jack's Beach Resort, Inc. v. Cía. Turismo, ante,* a la pág. 352. (Énfasis nuestro.)

Es decir, los varios criterios guiarán el proceso judicial de atemperar el impacto de una cláusula penal convenida, a saber: (1) la índole o el tipo de incumplimiento de la obligación principal, y (2) la intensidad del perjuicio ocasionado al acreedor. Por lo tanto, existe una relación directa entre ambos elementos o criterios, pues a menor *"perjuicio realmente sufrido"* menor *"debe ser la cuantía de la pena." WRC Props., Inc. v. Santana, ante,* a la pág. 138. Es decir, en nuestra jurisdicción prevalece un criterio de proporcionalidad entre el daño efectivo ocasionado al acreedor y el monto de la pena que debe pagar el deudor. Simplemente, la moderación es un remedio en equidad contra el rigor o la excesiva onerosidad de una cláusula penal. *Jack's Beach Resort, Inc. v. Cía. Turismo, ante,* a la pág. 350.

Asimismo, la cláusula penal puede referirse a otras partidas, tales como honorarios de abogado, costas y gastos, pues ésta queda sometida a la libre voluntad de contratación de las partes. Por ello, la cuantía de

honorarios de abogado pactados es también por su naturaleza parte del diseño punitivo para apremiar al deudor y conminarlo a cumplir bajo pena de grave perjuicio económico. En su consecuencia, la función de moderación no puede llevarse al punto extremo de la determinación de *quántum meruit*[1] que conlleva la eliminación de la cláusula penal contrario a lo convenido. Por el contrario, la función moderadora procura una adecuación que sin eliminar el carácter penal de la cláusula, reduzca la pena a una más justa proporción al grado de culpa y la dimensión del perjuicio causado. *Jack's Beach Resort, Inc. v. Cía. Turismo, ante,* a la pág. 353.

Sin embargo, los tribunales deben ejercer dicha moderación con *"gran cautela y notoria justificación",* por lo que debe utilizarse *"únicamente en circunstancias extraordinarias, como medio de templar su excesiva onerosidad para el obligado, o la desorbitada desproporción." Jack's Beach Resort, Inc. v. Cía. Turismo, ante.*

### III

En su primer señalamiento de error, la parte apelante alega que incidió el TPI al no concluir que la parte apelada es responsable en su carácter personal del pago de la totalidad de las deudas habidas con el Sr. Román Almodóvar. Sostiene que de la escritura de compraventa se desprende que la parte apelada se obligó a satisfacer las mismas. No le asiste la razón.

De acuerdo al precitado Artículo 164 de la Ley Hipotecaria, para que un tercero asuma la deuda de un deudor original, es necesario que sea aceptado como tal por consentimiento del acreedor hipotecario. 30 L.P.R. A. §2560; véase además, *Calo Rivera v. Reyes,* 115 D.P.R. 123, 126 (1984); *Teachers Annuity v. Soc. de Gananciales, supra.* Conforme a este caso, es claro que al adquirir el comprador la propiedad hipotecada sin que se hubiera logrado el cambio de deudor con el consentimiento del acreedor, ambos se convierten en deudores frente al acreedor. Examinado el expediente ante nuestra consideración, no encontramos que el BBVA haya prestado su consentimiento o llegara a un acuerdo, de forma expresa o tácita, para relevar al deudor primitivo, el Sr. Román Almodóvar, y aceptar como nuevo deudor a la parte apelada. La mera aceptación por el acreedor hipotecario de pagos hechos por un supuesto nuevo deudor, no significa, sin más, que el acreedor ha liberado al deudor primitivo y aceptado que el supuesto nuevo deudor ha asumido la deuda.

Tampoco encontramos que al adquirir el inmueble gravado con la hipoteca, la parte apelada se obligara a asumir el pago de todas las deudas incurridas por el Sr. Román Almodóvar con el BBVA. Examinada la escritura de compraventa, coincidimos con el foro apelado al concluir que la parte apelada únicamente se obligó a satisfacer el pago del balance adeudado de la suma original de $112,000.00 garantizada por la hipoteca sobre el inmueble antes descrito. Por ende, la parte apelada únicamente responde ante la parte apelante con el bien hipotecado y no se subrogó en la persona del deudor original en cuanto a sus obligaciones personales.

En su segundo señalamiento de error, la parte apelante alega que incidió el TPI al no disponer nada respecto al pago de costas, gastos y honorarios de abogado en el dictamen apelado. Al respecto, le asiste la razón. Examinado el pagaré hipotecario suscrito por el Sr. Román Almodóvar, encontramos que expresamente éste pactó que en la eventualidad de que se tuviera que llevar una reclamación judicial en su contra, se comprometía al pago de las costas del procedimiento y al pago de un diez por ciento (10%) del principal adeudado para costas, gastos, desembolsos y de honorarios de abogado. [4] Sin duda alguna, estamos ante una cláusula contractual denominada como *"cláusula penal"* que sería exigible ante el deudor hipotecario que incumpla su obligación. Toda vez que la parte demandada, mediante compraventa, se obligó como deudora hipotecaria a satisfacer el pago total de la deuda garantizada con el inmueble, el TPI debió haber impuesto una cuantía adicional por concepto de costas, gastos y honorarios de abogado según pactados. Claro está, el TPI retiene la facultad de atemperar la cláusula penal si la obligación principal fue en parte o irregularmente cumplida por el deudor hipotecario y considera que la misma adolece de onerosidad.

### IV

En mérito de las consideraciones antes expresadas, se confirma la Sentencia apelada. Sin embargo, se

devuelve el caso al TPI para que imponga la cuantía por concepto de costas, gastos y honorarios de abogado, de acuerdo a la cláusula penal contenida en la Escritura Núm. 106 de Hipoteca en Garantía de Pagaré, y si lo estima pertinente, ejercer su facultad moderadora, en atención a lo dispuesto en el Artículo 1108 del Código Civil de Puerto Rico, 31 L.P.R.A. §3133.

Lo`acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. María Elena Pérez Ortiz
Secretaria del Tribunal de Apelaciones

### ESCOLIOS 2008 DTA 73

**1.** La descripción del inmueble es la siguiente:

*"RUSTICA: Parcela marcada con el número 130-A en el plano de parcelación de la Comunidad Rural Cristina de los Barrios Amuelas y Tijeras del término municipal de Juana Díaz, Puerto Rico, con una cabida superficial de 0.1363 cuerdas, equivalentes a 536.00 metros cuadrados. En lindes: por el Norte, con la parcela número 106 de la comunidad; por el Sur, con la calle número 2 de la comunidad; por el Este, con la parcela número 130 de la comunidad; y por el Oeste, con la parcela número 129 de la comunidad. Enclava en este solar una estructura de hormigón de una sola planta con las siguientes medidas: 30 pies de ancho, 52 pies de largo y 12 pies de alto, de acero reforzado, con puertas de acero. Tiene un total de 3 puertas de acero."*

**2.** Véase, *Contrato de Prenda, Recurso de Apelación*, Apéndice, Anejo III, folio 43.

**3.** Véase, *Escritura de Compraventa y Asunción de Hipoteca Núm. 11*, Recurso de Apelación, Apéndice, Anejo V, folio 60.

**4.** Véase, Escritura Número 106 sobre Hipoteca en Garantía de Pagaré, Recurso de Apelación, Anejo V, folio 52.